779 A.2d 1043 (2001)
140 Md. App. 69
Elizabeth AZARIAN, et vir.,
v.
Jeffrey F. WITTE.
No. 812, Sept. Term, 2000.
Court of Special Appeals of Maryland.
September 4, 2001.
*1045 Barry J. Rosenthal (Bromberg, Rosenthal, Siegel & Goodman, and Malcolm P. Herman, on the brief), Rockville, for Appellants.
H. Kenneth Armstrong (Armstrong, Donohue, Ceppos & Vaughan, Chartered, on the brief), Rockville, for Appellee.
Argued before MURPHY, C.J., and SONNER, and KRAUSER, JJ.
*1044 KRAUSER, J.
The "attesting expert provision"[1] of the Maryland Health Care Malpractice Claims Act (the "Act")[2] provides that all claimants under the Act must file a "certificate of a qualified expert," more commonly known as "a certificate of merit,"[3] in which an expert attests that "a departure from the standard of care" by the defendant health care provider was the proximate cause of *1046 the claimant's medical injury. That provision, however, limits who may make such an attestation by stating that an "attesting expert may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims."[4] It is this limitation that lies at the core of this appeal.
Appellants, Elizabeth and Mark Azarian, ask us to determine whether the Circuit Court for Montgomery County erred in ruling that appellants' expert was in violation of the 20 percent limitation on activities "directly involv[ing] testimony in personal injury claims" and that, as a result of the violation, their certificate was invalid. Because a valid certificate is a precondition to maintaining a cause of action for medical malpractice both before the Health Claims Arbitration Office ("HCAO") and the circuit court, the motion for summary judgment of appellee, Jeffrey F. Witte, M.D., was granted, and appellants' claim was dismissed. This appeal is from that dismissal.
Before addressing this issue, however, appellants request that we consider whether the circuit court had the "jurisdiction" to review their certificate in the first place and, if it did, whether appellee's motion for summary judgment, having been previously denied, was properly before that court. And finally, appellants question the constitutionality of the "attesting expert" provision, which they claim is unconstitutionally vague.
For the reasons that follow, we conclude that the circuit court did have the right to review appellants' certificate to determine whether it complied with the "attesting expert" provision of the Act and to grant appellee's second motion for summary judgment. We shall, however, reverse the judgment of the circuit court on the ground that it erred in ruling that appellants' expert had "devot[ed] annually more than 20 percent of [his] professional activities to activities that directly involve[d] testimony in personal injury claims" and was thus disqualified from serving as an "attesting expert." And, based on that erroneous conclusion, it incorrectly held that appellants' certificate was invalid and dismissed their claim. Accordingly, we shall reverse the judgment of the circuit court and remand this case to that court for further proceedings. Because this "`case can be properly disposed of on a non-constitutional ground,'" we shall not reach appellants' constitutional claim. Professional Staff Nurses Assoc. v. Dimensions Health Corp., 346 Md. 132, 138, 695 A.2d 158 (1997)(quoting State v. Lancaster, 332 Md. 385, 631 A.2d 453 (1993)).

BACKGROUND
On May 28, 1998, appellants, Elizabeth and Mark Azarian, filed a medical malpractice claim against appellee, Jeffrey F. Witte, M.D., in the Maryland Health Claims Arbitration Office (the "HCAO"), claiming that Dr. Witte's failure to treat properly Elizabeth's fractured ankle had resulted in, among other things, permanent and substantial neurological damage to that limb. The complaint consisted of two counts: one for malpractice and the other for loss of consortium.
Three weeks later, pursuant to § 3-2A-04(b), appellants filed a certificate of merit signed by Lawrence F. Honick, M.D. In that certificate, Dr. Honick certified, among other things, that "[l]ess than twenty percent (20%) of [his] professional activities are devoted annually to activities that directly involve testimony in personal injury claims." In addition to that certificate, appellants also filed a waiver of arbitration. *1047 Upon receipt of that waiver, the HCAO issued an order that day transferring appellants' claim to the Circuit Court for Montgomery County.
On July 21, 1998, appellants filed in the Circuit Court for Montgomery County a complaint for medical malpractice and loss of consortium. Several months later, appellee deposed Dr. Honick. As a result of that deposition, appellee filed a Motion in Limine and for Summary Judgment, seeking to bar Dr. Honick from testifying; Honick, appellee claimed, devotes annually "more than 20 percent of his professional activities to activities that directly involve testimony in personal injury claims," in violation of § 3-2A-04(b)(4). That motion was denied.
On February 1, 2000, a jury trial of this case began. On the third day of trial, Dr. Honick was called by appellants to testify as to the applicable standard of care and as to whether appellee's breach of that standard caused Elizabeth Azarian's injuries. Following the voir dire of Dr. Honick, appellee renewed his motion for summary judgment, claiming that Dr. Honick's voir dire testimony revealed that he devoted annually "more than 20 percent of the [his] professional activities to activities that directly involve[d] testimony in personal injury claims."
In interpreting the "attesting expert" provision, the circuit court first construed the words "directly involve testimony" to mean "the examination, preparation, depositional, and court testimony." The court explained:
[W]hen a claimant under the arbitration system comes before that system, and a physician examines not as a treating [physician], but as a forensic examining physician, and then spends time preparing with the attorney, and then spends time testifying either in deposition or in courtand I didn't include also writing up reports and the like, and reviewing other physician records, then I consider that direct activities that directly involve testimony.
It then ruled that appellee had not produced sufficient evidence that Dr. Honick had violated the 20 percent limitation of the "attesting expert" provision but nonetheless permitted Honick's voir dire to continue. Upon concluding that examination, appellee renewed his motion for summary judgment. In reviewing that motion, the circuit court stated:
The Court has received the benefit of the testimony of the witness on voir dire, and the witness I think has made it abundantly clear that a large portion of his practice, and at times the way I calculate it, is 95 percent of his practice presently.
But a most generous examination I think would be that it is somewhere above 50 percent, 50 percent or higher, during the period of time in which the witness certified was devoted to either what is referred to euphemistically on the board as an IME.
* * *
And that there were also referrals from attorneys for purposes of treatment, but that is only at most a quarter of Dr. Honick's practice. It is a fact that I find that Dr. Honick does devote more than 20 percent of his practice for the purpose of20 percent of his professional activity is directly involved in activities that lead to testimony in personal injury claims, or could lead to testimony in personal injury claims.
And whether it actually leads to personal injury claim testimony I think is not the relevant criteria, but whether or not it could lead to it. Obviously, many claims can settle or not.

*1048 And in fact I find that Dr. Honick is greatly in excess of that at the time of the certificate and at the present time.
* * *
In this case, I think it is a proper motion to attack the basis of the certification, and therefore the basis to bring the claim if indeed the certifying expert has been demonstrated to have not presented the appropriate qualifications at the time of the certification.
The court then stated that it was "going to reserve [its ruling] on the issue of whether or not the certification was proper." At the request of both parties, however, the court reversed its position and made the following ruling:
[T]he court, in looking at the factual testimony of Dr. Honick in the light most favorable to the plaintiff, finds that 25 percent of Dr. Honick's time is devoted to the specific kind of activities which under Courts and Judicial Proceedings cannot exceed 20 percent. That is, the professional activities that directly involve testimony in personal injury claims.
And the Court treats for the purpose of this the actual testimony, the testimony preparation, the review of records, the preparation of reports, and all other forensic activity. Whether or not it results in testimony is not the issue, and that is not the standard set forth by the statute.
It says directly involved testimony, and I find that Dr. Honick's activities at the time of the making of the affidavit were 25 percent or greater. Now, the question is whether or not therefore that the affidavit and certificate are adequate. The Court finds that they are not. It is not. That if it is not, what is the sanction.
* * *
So, if it is not adequate, then the Health Claims Arbitration Action fails. Therefore, the Circuit Court action fails.
* * *
Here, where the Court finds that the certificate on its face, and based on testimony, is inadequate, inevitably leads to the conclusion that there is no basis before the Health Claims Arbitration Office; that the motion for summary judgment, or to dismiss, as might be the casewell, it would have to be summary judgment, should be granted based upon the unrebutted testimony of Dr. Honick that 25 percent of his practice at the time of the filing of the certificate was for forensic purposes.
And therefore he failed to comply with the requisites of law....
After observing that a "certificate of merit is a condition precedent to the prosecution of a medical malpractice claim," the court granted Dr. Witte's motion for summary judgment. The Azarians then filed a Motion to Alter or Amend Judgment. Following the denial of that motion, appellants noted this appeal.

DISCUSSION

I
Appellants contend that the circuit court has no "jurisdiction" to review any prearbitration decisions of the HCAO, including a decision by the HCAO as to the validity of a certificate of a qualified expert, more commonly known as a "certificate of merit". Assuming that to be true, they then claim that the HCAO's order, transferring this case to the circuit court, constituted a pre-arbitration decision as to the validity of the certificate and that the circuit court thus lacked the jurisdiction to review that issue. They further contend *1049 that since the circuit court did not have "jurisdiction" to review the validity of the certificate, it erred in permitting appellee to cross examine Dr. Honick at trial regarding the substance of that certificate.
Before considering the substance of appellants' claim, however, we feel impelled to address briefly what appears to be a confusion of concepts engendered by appellants' mistaken use of the term "jurisdiction" in framing this issue. As explained by the Court of Appeals in Oxtoby v. McGowan, 294 Md. 83, 447 A.2d 860 (1982), the Health Claims Arbitration Act "does not take away the subject matter jurisdiction of a circuit court to hear and render judgments in cases involving claims which fall within the Act." Id. at 91, 447 A.2d 860. It merely "creates `a condition precedent to the institution of a court action....'" Id. (quoting Attorney General v. Johnson, 282 Md. 274, 284, 385 A.2d 57 (1978)). Accordingly, the issue before us is not whether the circuit court had the jurisdiction to review the validity of the certificate but whether it had the right to so.
As to the merits of appellants' claim, we note preliminarily that the Act requires "[a] person having a claim against a health care provider for damage due to a medical injury [to] file his claim with the Director [of the HCAO]," § 3-2A-04(a)(1) and, within 90 days of that, to file "a certificate of a qualified expert with the Director attesting to departure from standards of care" by the defendant health care provider. § 3-2A-04(b)(1)(i).
The Act further provides that the defendant must file, in response, an opposing certificate "within 120 days from the date the claimant served the certificate ... on the defendant." § 3-2A-04(b)(2). "The attesting expert" of either party may not be someone who "devotes annually more than twenty percent of [his] professional activities to activities that directly involve testimony in personal injury claims." § 3-2A-04(b)(4). The certificate of both parties must be accompanied by "a report of the attesting expert." § 3-2A-04(b)(3). "Discovery is available as to the basis of the certificate" of either party. § 3-2A-04(b)(3).
"After filing the certificate of a qualified expert required by § 3-2A-04(b)," "any claimant may waive arbitration at any time... by filing with the Director a written election to waive arbitration...." § 3-2A-06B(b)(1). "If the claimant waives arbitration... all defendants shall comply with the requirements of § 3-2A-04(b) of this subtitle by filing their certificates at the Health Claims Arbitration Office or, after the election, in the appropriate circuit court or United States District Court." § 3-2A-06B(b)(3).
"[A]ny defendant may [also] waive arbitration at any time after the claimant has filed the certificate of qualified expert...." The defendant shall do so "by filing with the Director a written election to waive arbitration ..." § 3-2A-06B(c)(1). If the defendant waives arbitration, he must file his certificate of a qualified expert with the HCAO, or after election of arbitration, with the circuit court. § 3-2A-06B(c)(3).
In other words, a claimant must file a certificate of a qualified expert with the HCAO before either party may waive arbitration. Once the claimant's certificate has been filed, either party may waive arbitration, whereupon the defendant must file his or her certificate with the circuit court.
As noted earlier, the Act provides that at least at the arbitration level "[d]iscovery is available as to the basis of the certificate." A corollary of the right of discovery is the right to challenge the certificate if discovery discloses that the attesting expert has violated the 20 percent limitation *1050 of the attesting expert provision. Consequently, the only question that remains is whether the certificate can be challenged, as it was here, at the circuit court level, following a waiver of arbitration.
To answer that question, we first note that there is no language in the Act that restricts the right to review such a certificate to the HCAO. Moreover, to so hold would mean that where the claimant, as here, filed the certificate and waiver on the same day or where the defendant has filed his or her certificate in the circuit court following the claimant's waiver of arbitration, as required by law, the certificate in question would escape review by both the HCAO and the circuit court and thereby undermine the purpose of that provision.
In the instant case, appellants filed their certificate and waiver on the same day. Because the HCAO, pursuant to that waiver, transferred appellants' claim to the circuit court, appellee had no time to conduct discovery or otherwise challenge that certificate before the HCAO. Were we to rule, as appellants would have us do, that such a certificate cannot be challenged in the circuit court, appellants' certificate would have escaped all review. Moreover, if we were to so hold, we can anticipate that every time a claimant in the future has a questionable certificate, which might not survive tribunal scrutiny, that claimant will choose to file his or her waiver and certificate on the same day and thereby avoid review of that certificate. We do not believe that it was the legislature's intent to devise a method of review that would permit the very claims that the procedure was created to weed out to escape scrutiny.
To address that untenable result, appellants contrive a novel argument. First, they cite Marousek v. Sapra, 87 Md.App. 205, 217-20, 589 A.2d 529 (1991), for the proposition that the circuit court has no right to review pre-arbitration rulings. Then, they claim that when the HCAO transferred this case to the circuit court, it in effect accepted the validity of the certificate and thereby rendered a pre-arbitration decision as to its validity, which, according to Marousek, they claim, renders that decision unreviewable by the circuit court. We disagree.
Once the claimant, in accordance with § 3-2A-06B(b)(1), has filed a certificate of merit and a written election to waive arbitration with the Director of the HCAO, the transfer of that case by HCAO to the circuit court is simply a ministerial function. It does not imply that the HCAO has made any determination as to the merits of that certificate. Indeed, upon the proper filing of waiver of arbitration, all further proceedings before the HCAO, including discovery, cease. It is analogous to this situation when a party requests a jury trial in the district court. If timely made, all district court proceedings involving that case cease, and the case is thereupon transferred to the circuit court, in accordance with Md. Rule 3-325, where the circuit court reviews the merits of that request. Just as the filing of a jury request divests the district court of jurisdiction to consider the jury prayer or to conduct any further proceedings, the filing of a waiver of arbitration divests the HCAO of any right to consider the validity of a certificate of merit or to conduct any further proceedings, except to transfer the claim at issue to the circuit court.
Moreover, because appellants chose to file their certificate and waiver together, no discovery had occurred regarding the basis of their certificate before the matter was transferred to circuit court. Consequently, the HCAO had no evidence before it with which to make a determination as to whether Dr. Honick's professional activities disqualified him from signing appellants' certificate as an "attesting expert."
*1051 The case sub judice is thus clearly distinguishable from Marousek. In Marousek, the issue before us was whether the circuit court had the right to review an arbitration panel's pre-arbitration ruling concerning the timeliness of a certificate of merit after the parties had waived arbitration, pursuant to § 3-2A-06A, the mutual waiver provision. As there was no prearbitration ruling in the instant case as to the validity of Dr. Honick's certificate, appellants' reliance on Marousek is inapposite.
Moreover, Marousek was decided by this Court before the enactment of § 3-2A-06B(b), the "unilateral waiver provision," which was the provision invoked by appellant to waive arbitration in the instant case. Unlike § 3-2A-06A, the "mutual waiver provision," the unilateral waiver provision requires the claimant to file a certificate of merit with or before the waiver of arbitration. It further requires the defendant to file an opposing certificate of merit in the circuit court, if the case has already been transferred there. § 3-2A-06B(b)(3) and § 3-2A-06B(c)(3). By requiring that the certificate be filed with or before the waiver and that the defendant file an opposing certificate in the circuit court, we must assume that the legislature concluded that both certificates should be and, under certain circumstances, could only be reviewable by the circuit court. In short, the Marousek ruling proscribing judicial review of pre-arbitration issues is limited to cases waived under the mutual waiver provision where the issues in question have been decided by an arbitration panel. We decline to extend that ruling to instances in which a case, as here, has been transferred to the circuit court pursuant to the unilateral waiver provision, and there has been no pre-arbitration ruling as to the issue before the circuit court.

II
Appellants claim that the circuit court erred in considering appellee's second motion for summary judgment after his first motion for summary judgment had been earlier denied on what, appellants claim, was essentially the same evidence.
Maryland Rule 2-501(a) provides, however, that "[a]ny party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." Because the "denial of a motion for summary judgment is an interlocutory order... it is within the power of the trial court later to grant a renewal of a summary judgment motion." Yamaner v. Orkin, 313 Md. 508, 516, 545 A.2d 1345 (1988) (citing Merchants Mortgage Co. v. Lubow, 275 Md. 208, 339 A.2d 664 (1975)). Furthermore, "it is clear not only that summary judgment may be granted at any stage of the proceedings, but also that summary judgment may be granted at a later point in a case, even though denied at an earlier one." Joy v. Anne Arundel County, Maryland, 52 Md.App. 653, 660-61, 451 A.2d 1237 (1982) (citations omitted). In other words, "the denial of a motion for summary judgment ... does not preclude resubmission of it at a later point in the proceedings," Ralkey v. Minnesota Mining and Manufacturing Co., 63 Md.App. 515, 522, 492 A.2d 1358 (1985) (citations omitted), particularly "where there has been some change of fact or law which substantially justifies the resubmission." Yamaner, 313 Md. at 516, 545 A.2d 1345.
Finally, "[w]hile the trial judges may choose to respect a prior ruling in a case, they are not required to do so." Ralkey, 63 Md.App. at 522-23, 492 A.2d 1358. Indeed, "`as a general principle, *1052 one judge of a trial court ruling on a matter is not bound by the prior ruling in the same case by another judge of the court; the second judge, in his discretion, may ordinarily consider the matter de novo.'" Gertz v. Anne Arundel County, 339 Md. 261, 273, 661 A.2d 1157 (1995) (citing State v. Frazier, 298 Md. 422, 449, 470 A.2d 1269 (1984)); see also Md. Rule 2-602(a)(3) (providing that "an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action ..., or that adjudicates less than an entire claim ...:(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.").
In the case sub judice, appellee first moved for summary judgment before trial based entirely on Dr. Honick's deposition testimony. That motion was denied by the Honorable Michael D. Mason. It was renewed by appellee at trial, after Dr. Honick's voir dire testimony. This time, it was granted by the trial judge, the Honorable Durke G. Thompson. Because summary judgment may be granted at any stage in the proceedings and because a second judge is not bound by an earlier judge's ruling in the same case, the trial judge properly exercised his discretion in reviewing, de novo, the second motion for summary judgment.
Moreover, appellee's resubmission of his motion was entirely appropriate, given the additional information elicited from Dr. Honick as to the nature of his practice during his voir dire examination by appellee. Expanding upon, and clarifying, his deposition testimony, Dr. Honick stated on voir dire that he had testified in court 300 to 400 times over a 30 year period; that he had had his deposition taken 300 to 400 times during that period; that of the 50 to 60 percent of his patients that are referred to him by attorneys, in half the cases "no treatment is required or requested;" that during 1997, 1998, and 1999, approximately 30 to 40 percent of his practice consisted of doing independent medical examinations; and that "[a]bout three-quarters of [his] time is treatment and the rest is evaluation probably." Thus, the circuit did not err in agreeing to consider appellee's second motion for summary judgment.

III
Having addressed the preliminary questions raised by appellants, we now turn to the principal issue presented by this appealwhether the circuit court misconstrued § 3-2A-04(b)(4), the "attesting expert" provision, in ruling that Dr. Honick "devoted annually more than 20 percent of [his] professional activities to activities that directly involve testimony and personal injury claims" and therefore was disqualified from signing appellants' certificate of merit as an "attesting expert." It was based on this ruling that the circuit court granted appellee's motion for summary judgment and dismissed appellants' claim.
To lay the factual context for our analysis, we shall set forth below the relevant portions of Dr. Honick's deposition and voir dire testimony. At his deposition, Dr. Honick testified as follows:
Q: Is it correct to state that 90 percent or more of your practice involves patients who are in some way connected with a lawsuit or workmen's compensation claim?
A: I take care of injured people. Baltimore is surrounded by interstate highways and we have a lot of heavy industry. So basically I see people that are injured on the job or are in automobile accidents or whatever, and they become plaintiffs in litigation. So that's what orthopedic surgeons do. All orthopods, a lot of their patients are involved in *1053 litigation of some sort or another since we treat injuries.
Q: Let's try that question again. Is it fair to say that more than 90 percent of your patients are patients that have either a lawsuit or a workmen's compensation claim?
A: That's not accurate, no.
Q: Have you testified to that previously?
A: No.
Q: Describe for me then the nature of your practice.
A: I think I can get around that, but your question wasn't very well put. 90 percent of my patients have some sort of litigation involved for the reasons I've just stipulated. Many of them are workers' compensation. Most of them, to my knowledge, don't even go to the lawsuit. So what I've testified in the past and what I'm going to testify to now is that about 90 percent of my patients do have some sort of litigation involved in addition to their medical claims.
* * *
Q: What percentage of your work week is spent in testimony or review of records in medical malpractice cases?
A: A very small percent. You can't even equilibrate per week. Some weeks can go by that I do nothing or a week can come in where I get a big pile of records that I have to spend several hours or half a day or two half-days that week going through the records. So it's very irregular.
Q: How about as far as medical-legal work in toto, how many depositions a week do you do?
A: I do on the average of one deposition a month. As I say, since most of my patients are plaintiffs and have litigation involved, all orthopods do, we get involved in court and depos, I probably do either go to court or do a deposition on the average of once a month.
* * *
Q: How many referrals from lawyers do you get a year?
A: A lot. Again, that's what orthopods do.
Q: We'll let a jury decide that. Let's try and answer the question. How many referrals do you get from lawyers a year?
A: For treatment of injuries or evaluations?
Q: Both.
A: I would guesstimate that probably 60 percent, 50, 60 percent of my practice at this time would be from either attorneys or compensation carriers.
Dr. Honick thus testified that 90 percent of his patients are involved in "some sort of litigation," that 50 to 60 percent of his practice is based on referrals from attorneys or compensation carriers, and that his deposition is taken approximately once a month.
At trial, Dr. Honick gave further testimony as to the percentage of time he devotes to professional activities other than treating patients:
Q: And can we agree, sir, that you have testified in court between 300 and 400 times?
A: Over a 30 year period, between 300 and 400.
Q: Can we also agree that you had your deposition taken, like many of these transcripts here in this box, again more than 300 to 400 times, during your career?
A: Probably. That's what orthopedists do as far as their profession.
Q: Can we agree that probably in the neighborhood of 60 to 70 percent of your *1054 patients are referred to you by attorneys?
A: I think it is probably more in the likelihood of 50 to 60. Again, I don't
Q: I am not going to quibble over that.
A: But it's i[n] that ball park.
Q: Okay. And that of your practice that are referred by attorneys, they are referred for purposes of evaluations and what are called independent medical examinations?
A: I would say that half of the ones that are referred to me by attorneys are probably evaluations only, and where no treatment is required or requested.
* * *
Q: Can we agree now that after having talked about this for some time that it is pretty clear from your practice and what you do that you spend more than 20 percent of your time in connection with personal injury matters?
A: Well, I think I have testified to that many times.
Q: Is it fair to say that that has been true for many years now?
* * *
A: Yes. That is what orthopedic surgeons do. We take care of injured people.
At this point, the court stated that it was "going to permit [ ] further voir dire" because it was "not satisfied from the precise questions and answers that [appellee had] pinned down the issue sufficiently."
Dr. Honick then testified as follows:
Q: Can we agree that as of July 29th, 1997 that approximately 30 to 40 percent of your practice would be doing independent medical examinations and evaluations?
A: In 1997?
Q: Yes, sir.
A: Probably.
Q: And can we agree, sir, that for 1997, 1998, and 1999, that that figure has been consistent; that approximately 30 to 40 percent are patients that you see for independent medical evaluations and examinations?
A: I guess so. Again, I don't keep statistics. I am just giving you a guesstimate.
Q: And when you gave those guesstimates under oath in other cases, and in giving a guesstimate here, you were trying to be as accurate as possible; is that correct?
A: Yes.
Q: Now, when we talk about doing independent medical examinations and evaluations, we are talking about a patient coming into you, whether it is from an attorney, or a workers compensation insurance carrier, or another insurance company, and they usually come with paperwork, with records, from other physicians who have seen the patient, right?
A: Paperwork usually arrives well ahead of time.
Q: So you have to sit down and go over that paperwork, and review it, in order to prepare to effectively and competently examine the patient when they come into the office, correct?
A: The paperwork allows me to effectively take a good history, or get a good history of what has happened since the injury occurred.
Q: But it makes it easier for you to know what is going on?
A: It gives me background information.
Q: And that after you complete that examination, you have to prepare a report either to the attorney or to the workmen's compensation carrier, or whoever sent you the patient, correct? *1055 A: That's correct.
Q: And that would then summarize your findings, and opinions, right?
A: Correct.
Q: And then as needed you have to then provide additional assistance in the litigation process to either the insurance carrier or to the attorney to discuss your report over the phone, or perhaps in a face-to-face conference, in order to educate them and apprise them as to what that report means?
A: Seldom does it get that far. Usually my reports are pretty straightforward, but occasionally I have to speak to an attorney or adjustor, or whatever.
* * *
Q: Now, in addition to doing independent medical examinations and evaluations, you have your own patients that are referred to you by these attorneys and by others for treatment; is that right?
A: That's correct.
Q: That there is this section, which is the independent evaluation section, and then there is the section of patients from attorneys for treatment. And what percentage is that, the rest of it?
A: Nowadays, I guess it would be five percent or so.
Q: Okay. How about in `96, `97, and `98?
* * *
THE WITNESS: I don't recall. Back then it might have been higher. Nowadays, there are big clinics that are owned by doctors and attorneys that do most of the personal injury work. So now it is about five percent probably. Back then it might have been 20 or 25 percent.
Q: And back then we are talking about `96 through `98?
A: Whatever year you brought up.
Q: Okay. Now, when you see these patients for treatment, you kind of have, if I can, use the phrase of a dual capacity, in the sense that you are obviously treating them for the medical problem that they present to you for.
But at the same time you are providing an ongoing, updated report to the attorney, or to the insurance carrier, about how this patient is doing and how this is progressing by basically sending them copies of your office notes on an every visit basis?
A: That's true. There is a document called The Code of Cooperation in Maryland between the medical and legal professions, that says that if I am treating a patient, and there is an attorney or insurance company involved, that I am obligated to send reports to the attorney and the insurance company on a timely basis.
Q: And you are doing this and assisting the attorneys in the preparation of their cases, and if necessary and it reaches that point, that you have a file that is all ready for you to review and look at to testify either in deposition [or] in a trial like this?
A: Well, as I said, I am required to do that. If I don't do that, the parties involve[d] call me or write me, and say we would like a report of your findings. What I do is send them copies of my office notes. What they do with them is up to them.
Q: So can we now, based upon this discussion that we have had together, can we now safely and comfortably say that over the past 2 or 3 years, depending on how you add these figures together, that for the past 2 or 3 years, in between 35 and 60 percent of your practice has been directly involved in personal injury matters? *1056 A: I think I said that a half-an-hour ago, yes.
THE COURT: Personal injury matters, or personal injury claims, legal claims.
[DEFENSE COUNSEL]: Right.
THE WITNESS: Well, with every accident, there seems to be a claim involved. What I am trying to say is that I see a lot of patients, as do all orthopedic surgeons, that involve injuries, and insurance companies, and lawyers, and that is part of the specialty.
Dr. Honick then testified on redirect as follows:
Q: If I could back up a little. Approximately how much time does it take for you to do an independent medical evaluation? It may be difficult to answer, but give an average.
A: Depending on how long and how old the case, and whether an accident occurred, any records that I am provided with, it could take between 15 minutes to a half-a-day.
Q: And so my question is that based on the percentage of patients you see, can you tell me what percent of time you spend in activities relating to personal injuries, or directly related to personal injury matters?
A: I am getting confused here. I thought the original question was how much time do I spend doing evaluations versus treatment?
Q: Okay. That's okay.
A: About three-quarters of my time is treatment and the rest is evaluation probably.
Q: And of those evaluations, not all of those are necessarily related to litigation are they?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
THE WITNESS: Related to litigation?
[PLAINTIFF'S COUNSEL]: Or end in litigation or even involve litigation?
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
THE WITNESS: No, I know that they have attorneys and insurance companies involve[d]. I never know what happens to them.
In reviewing appellants' contention that the trial court erred in granting summary judgment in favor of appellee, we note that summary judgment is appropriate only when, after viewing the motion and response in favor of the non-moving party, there is no genuine issue of material fact, and the party in whose favor judgment is entered is entitled to judgment as a matter of law. Pittman v. Atlantic Realty Co., 127 Md.App. 255, 269, 732 A.2d 912, rev'd on other grounds, 359 Md. 513, 754 A.2d 1030 (2000); Md. Rule 2-501(e). The standard of review we apply "is whether the trial court was legally correct." Heat & Power Corp. v. Air Prods. & Chems., Inc., 320 Md. 584, 591, 578 A.2d 1202 (1990). In making that determination, "we do not accord deference to the trial court's legal conclusions," Lopata v. Miller, 122 Md. App. 76, 83, 712 A.2d 24, cert. denied, 351 Md. 286, 718 A.2d 234 (1998), and, in fact, we review the trial court's legal conclusions de novo. See Matthews v. Howell, 359 Md. 152, 162, 753 A.2d 69 (2000).
As there is no genuine issue of material fact in dispute concerning the nature of Dr. Honick's practiceindeed, Dr. Honick's testimony about his practice was neither rebutted nor disputed by appellee we turn to the question of whether the circuit court was "legally correct" in its interpretation of § 3-2A-04(b)(4) and its application of that interpretation to the facts of this case.
The "attesting expert" provision's prohibition against "the attesting expert ... devot[ing] more than 20 percent of [his or her] activities to activities that directly involve testimony in personal injury *1057 claims" is not, to be generous, free of ambiguity. Key terms in this statute, such as "directly" and "annually" are left undefined. "Annually," for example, is expressly defined as "a calendar year" in Section 20-411(b)(1) of the Insurance Article,[5] Section 8-606(b) of the Labor and Employment Article,[6] Section 5-302(a)(1) of the Public Utility Companies Article,[7] and Section 3-104(a)(4) of the Transportation Article; [8] as a "fiscal year" in Section 13-301(b) of the Education Article,[9] Section 14-107(a)(5) of the Estates and Trusts Article,[10] and Section 5-901(b) of the Natural Resources Article;[11] and as the "preceding twelve-month period" in Section 19-307.2(b) of the Health General Article,[12] and Section 15-1007(b) of the Insurance Article. Unfortunately, neither the attesting expert provision nor the Act itself provides much assistance in clarifying what constitutes activities that "directly involve testimony in personal injury claims" and what twelve-month period the term "annually" refers to.
Our first step in resolving these ambiguities is to note that the Act itself is in derogation of the common law and therefore, under well settled Maryland law, to be construed narrowly. Indeed, it is axiomatic that "[w]here there is any doubt about [the statute's] meaning or intent they are given the effect which makes the least rather than the most change in the common law." 3 Sutherland, STATUTORY CONSTRUCTION § 61.01 (5th ed.). In fact, unless the legislature makes it expressly clear that its purpose is to change the common law, it is presumed that no such change was intended. See Robinson v. State, 353 Md. 683, 693, 728 A.2d 698 (1999) (holding that a statute does not change the common law unless it expressly states that it does). In addition, statutes are presumed to change the common law only to the extent absolutely required for that statute's enactment. Lutz v. State, 167 Md. 12, 15, 172 A. 354 (1934). As the Court of Appeals recently opined:
"[I]t is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required," ... "[t]he law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced."

State v. North, 356 Md. 308, 312, 739 A.2d 33 (1999) (quoting Hooper v. Mayor & C.C. of Balto., 12 Md. 464, 475 (1859)).
Before July 1, 1986, medical malpractice claimants were not required to provide "a certificate of a qualified expert ... attesting to departure from standards of care, and that the departure from standards of care [was] the proximate cause of the alleged injury ..." or face dismissal of their claims. The current requirements of § 3-2A-04(b)(1)(i) apply only to claims filed after July 1, 1986. By imposing this and other mandatory procedural requirements on claimants, the Act in effect modifies the common law. It not only determines who may testify for a claimant but whether a claimant has an action at all. As the Act in general and the "attesting expert" provision in particular are in derogation of the common law, they must be narrowly construed.
Moreover, where the legislature has not wanted this canon of statutory construction *1058 to apply, it has expressly said so. For example, Maryland Code Ann. (1991, 1999 Repl.Vol.), § 9-102(b) of the Labor and Employment Article states: "The rule that a statute in derogation of the common law is to be strictly construed does not apply to this title." Such language is plainly missing from the Act. We therefore conclude that it was not the legislature's intent that this canon of statutory construction not apply to the Act or that the provisions of the Act not be strictly construed to the extent that they conflict with the common law.
In interpreting a statute such as the one before us, we look first to the words of the statute, giving them their "natural and ordinary signification, bearing in mind the statutory aim and objective." Richmond v. State, 326 Md. 257, 262, 604 A.2d 483 (1992). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." Jones v. State, 336 Md. 255, 261, 647 A.2d 1204 (1994).
Even if the statute is clear and unambiguous, however, "we are not `precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law." Morris v. Prince George's County, 319 Md. 597, 604, 573 A.2d 1346 (1990)(quoting Wilde v. Swanson, 314 Md. 80, 92, 548 A.2d 837 (1988)). Moreover, "[t]he legislative history of a statute, including amendments that were considered and/or enacted as the statute passed through the Legislature, and the statute's relationship to earlier and subsequent legislation are `external manifestations' or `persuasive evidence' of legislative purpose that may be taken into consideration." Rose v. Fox Pool, 335 Md. 351, 360, 643 A.2d 906 (1994).
In analyzing a statute, "we must always be cognizant of the fundamental principle that statutory construction is approached from a "`commonsensical'" perspective. Thus we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." Frost v. State, 336 Md. 125, 137, 647 A.2d 106 (1994)(internal citations omitted). We also avoid constructions that would "lead to absurd results." Thanos v. State, 332 Md. 511, 525, 632 A.2d 768 (1993); Richmond, 326 Md. at 262, 604 A.2d 483.
We now turn to the two most troubling terms in the "attesting expert" provision, "directly" and "annually." "Annually" is defined by BLACK'S LAW DICTIONARY 89 (6th ed.1990) as "[i]n annual order or succession; yearly, every year, year by year. At end of each and every year during a period of time. Imposed once a year, computed by the year. Yearly or once a year, but does not in itself signify what time in year." See also Phillips Petroleum Co. v. Harnly, 348 S.W.2d 856, 860 (Tex.Civ.App.1961). In short, "annually" is defined as "yearly." And a "year" is defined by that dictionary as "[t]welve calendar months beginning January 1 and ending December 31." BLACK'S LAW DICTIONARY (7th ed.1999). Moreover, in common parlance, "a year," is commonly understood to mean a "calendar year." We therefore conclude that the "calendar year," beginning January 1 and ending December 31, is the temporal unit of measurement that the legislature intended by the term "annually." Accordingly, in determining whether an attesting expert has violated the "20 percent" limitation of § 3-2A-04(b)(4), the court must look at the professional activities that an expert has devoted "to activities that directly involve testimony in personal injury claims" during the preceding "calendar year."
We next consider the question of what professional activities are activities that "directly involve testimony" and, therefore, *1059 are covered by the 20 percent limitation of the attesting expert provision. The ambiguity of this phrase posed a formidable challenge to the circuit court. Understandably, that ambiguity led to confusion, and the circuit court offered different and conflicting definitions of that phrase. Initially, the circuit court defined the words "directly involves testimony" to mean:
[T]he examination, preparation, depositional, and court testimony. In other words, when a claimant under the arbitration system comes before that system, and a physician examines not as a treating [physician], but as a forensic examining physician, and then spends time preparing with the attorney, and then spends time testifying either in deposition or in courtand I didn't include also writing up reports and the like, and reviewing other physician records, then I consider that direct activities that directly involve testimony.
Later, it expanded that definition, stating:
And the Court treats for the purpose of this the actual testimony, the testimony preparation, the review of records, the preparation of reports, and all other forensic activity.
In both instances, though reaching different results, the circuit court uses the same standard: whether the professional activities "lead to or could lead to testimony in personal injury claims." However, in finally ruling on the certificate, the court suggests that it would also count all "forensically related" activities, stating that it was basing its determination "that the certificate [was] not adequate" on the testimony of Dr. Honick "who [had] opined that at least 25 percent of his practice was forensically related." That appears to be a reference to Dr. Honick's testimony that "[a]bout three quarters of [his] time is treatment and the rest is evaluation." Fortunately, we do not have to determine which standard is broader: the "could lead to testimony in personal injury claims" standard or the "forensically related" standard, or whether they are even the same standard, as both are far broader than we believe is appropriate given the legislative history and the purpose of the attesting expert provision.
We reject the circuit court's expansive construction of the phrase "directly involve testimony" in favor of a narrower construction. We do so for two reasons: first, as we previously stated, statutory language which restricts how and whether a common law claim for negligence can be filed, as the attesting expert provision does, is in derogation of the common law and therefore must be construed strictly. And second, given the legislative history of the "attesting expert" provision, the legislature clearly intended that that provision be given a narrow application.
Indeed, an earlier version of Senate Bill No. 559 that, in 1986, created the 20 percent limitation on professional activities that "directly involve testimony," originally stated that the attesting expert may not receive more than 50 percent of the expert's income from testimony and other activity related to personal injury claims. Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 559 (1986). The "fifty percent income restriction" was changed to a "20 percent activities restriction" by the Senate Judicial Proceedings Committee, which feared that "requiring an expert to reveal the details of his finances in order to determine whether more than 50% of his income was from testimony in personal injury cases would make it too difficult to find an expert to testify." Senate Judicial Proceedings Committee, Summary of Committee Report, Senate Bill 559, at 10 (1986).
But no less important for the purposes of this analysis, the Committee, in modifying *1060 that provision, narrowed the range of relevant professional activities that would fall within the purview of that limitation from "testimony and other activities related to personal injury claims" to "activities that directly involve testimony." By limiting the scope of that provision to only activities that involve testimony and then only to those that "directly" involve testimony, the legislature clearly intended to prevent this provision from being given an expansive reading and thereby render otherwise qualified experts, unqualified to testify. As the legislature eliminated the 50 percent income restriction because it feared that such a limitation would make it too difficult to find an expert to testify, we must assume that it did not intend to have the 20 percent activities limitation to be so broadly construed that it would create the very problem the legislature hoped to avoid by rejecting the 50 percent income limitation.
And that is precisely what could occur were we to ignore the plain language of the provision and its legislative history and adopt the circuit court's position that activities that "directly involve testimony" include all professional activities "that could lead to testimony in personal injury claims" or are "forensically related." As Dr. Honick observed, "see[ing] people that are injured on the job or are in automobile accidents or what ever" is what "orthopedic surgeons do" and these people "become plaintiffs in litigation." Given that fact, an interpretation of the attesting expert provision that would disqualify an expert because he or she had devoted more than 20 percent of his or her time to activities that "could lead to testimony in personal injury cases" would disqualify orthopedists and other doctors, who, because of the nature of the ailments they treat, are more frequently asked to perform independent evaluations, as a class from testifying at all.
Nonetheless, using that standard, the circuit court ruled that because medical evaluations constitute 25 percent of Dr. Honick's practice and because those evaluations "could lead to testimony" or are "forensically related," Dr. Honick was ipso facto disqualified from serving as an attesting expert. Medical evaluations, however, regardless of whether they are requested by a lawyer or an insurance company, are not necessarily activities that "directly involve testimony in personal injury claims." In fact, most evaluations, even those requested by lawyers or insurance companies, are performed with little or no expectation that testimony will ever be required. Indeed, only when a medical evaluation is performed in preparation for testifying does that evaluation fall within the 20 percent limitation. Then and only then can it be said to be an activity that directly involves testimony. In other words, the activities contemplated by the 20 percent limitation are those activities which are principally performed to prepare for or engage in testifying. In addition to actually testifying, that would include, among other things: meetings, telephone conferences, the review of documents, the preparation of reports and other measures performed principally to prepare for or, as in the case of affidavits, in place of testifying as well as travel to and attendance at trial or depositions. We stress, however, that testimony does not have to actually occur for the preparatory activities to fall within the purview of the 20 percent limitation.
Finally, the evidence does not support the trial court's conclusion that Dr. Honick violated the 20 percent limitation of the attesting expert provision. He stated that over a thirty-year period he had testified at 300 to 400 hundred trials and the same number of depositions. Unaccountably, appellee never questioned him as to how much time he had spent preparing to testify. *1061 Nor did he ask him point blank what percentage of his professional activities he "devote[d] annually" to "activities that directly involve testimony in personal injury claims." Instead, he queried Dr. Honick as to the amount of time or the percentage of his practice "directly involved in personal injury matters." That of course is not the appropriate standard. Presumably, an orthopedist, specializing in treating injuries, spends a great deal of time "in personal injury matters." Accordingly, there was no evidence from which the circuit court could conclude that Dr. Honick did not qualify as an "attesting expert."
JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
COSTS TO BE PAID BY APPELLEE.
NOTES
[1] Maryland Code (1974, 1998 Repl.Vol., 2000 Cum.Supp.), § 3-2A-04(b)(4) of the Courts and Judicial Proceedings Article.
[2] §§ 3-2A-01 through 3-2A-09 of the Courts and Judicial Proceedings Article. Unless otherwise indicated, all future statutory references are to Maryland Code (1974, 1998 Repl. Vol., 2000 Cum.Supp.), §§ 3-2A-01 through 3-2A-09 of the Courts and Judicial Proceedings Article.
[3] "Certificate of merit" is the term that trial courts and lawyers commonly use to refer to this certificate. The difference in terminology arises from the fact that the Act refers to the § 3-2A-04 certificate as a "certificate of a qualified expert," while the attendant regulations refer to it as a "certificate of merit." COMAR 01.03.01.01(5).
[4] § 3-2A-04(b)(4).
[5] Md.Code (1997).
[6] Md.Code (1999 Repl.Vol.).
[7] Md.Code (1998).
[8] Md.Code (1993 Repl.Vol.).
[9] Md.Code (1999 Repl.Vol.).
[10] Md.Code (1991 Repl.Vol. & 2000 Supp.).
[11] Md.Code (2000 Repl.Vol.).
[12] Md.Code (2000 Repl.Vol.).