WILLARD G. OXTOBY, Personal Representative of the
Estate of Layla Oxtoby, Deceased ET AL. *v.* LARRY
McGOWAN

[No. 137, September Term, 1981.]

*Decided July 23, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ.

*George W. Shadoan* for appellants.

*Albert D. Brault,* with whom were *Janet S. Zigler* and *Brault, Graham, Scott & Brault* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This appeal involves the Health Care Malpractice Claims Act (the Act), Md. Code (1974, 1980 Repl. Vol., 1981 Cum. Supp.), §§ 3-2A-01 through 3-2A-09 of the Courts and Judicial Proceedings Article. The Act was adopted by Ch. 235 of the Acts of 1976. Section 5 of Ch. 235, the effective date clause, provides that the Act "shall take effect July 1, 1976, and shall apply only to medical injuries occurring on or after that date." The principal issue presented here requires interpretation of "medical injuries occurring," as used in the

effective date clause. An issue involving attempted juror impeachment of a jury verdict is also raised.

In general, the Act requires certain medical malpractice claims to be submitted to an arbitration panel for initial ascertainment of liability and damages before resort may be had to a court of law for final determination. There were no arbitration proceedings prior to the filing of this medical malpractice case in the Circuit Court for Montgomery County. The case consumed 21 trial days, including three days of jury deliberations, between December 8, 1980 and January 9, 1981. Verdict and judgment were for the defendant. The plaintiffs did not obtain a transcript of the testimony for their appeal, for reasons to be explained below. There is no agreed statement of facts. Consequently, our recital of the factual background is based upon the limited record extract.

Willard Oxtoby (Willard) and Layla Oxtoby (Layla), husband and wife, sued Larry McGowan, M.D. (McGowan) on November 20, 1979. McGowan is a resident of Montgomery County whose office is in the District of Columbia. Count I of the declaration alleged that Layla had contracted in February 1974 with McGowan for the latter to perform a total vaginal hysterectomy and bilateral salpingo oophorectomy on Layla. Because Layla had a family history of ovarian cancer, the operation was needed to prevent the development of this disease in Layla. The surgery was performed on February 14, 1974 at George Washington University Hospital in the District of Columbia. The declaration alleged that McGowan negligently had failed to remove all of Layla's left ovary and tube, with the result that Layla developed ovarian cancer in or about April 1977. Surgery to attempt to remove the cancer was performed on July 3, 1979. The pleading states that during the course of that surgery it was discovered that portions of Layla's left ovary and fallopian tube remained in her body. Count I of the declaration presented Layla's claim for money damages. In Count II Willard's claim for damages based on medical expenses incurred was set forth, while Count III presented the joint claim for damage to the marital relationship.

Layla died as a result of cancer on June 17, 1980. An amended declaration, consisting of four counts, was filed August 6, 1980. Count I was brought by Willard, as personal representative of Layla's estate, asserting Layla's surviving claim and the estate's claim for funeral expenses.[1] Counts II through IV respectively asserted wrongful death claims by Willard and by each of Layla's two children.

After the close of all of the trial testimony the defendant, on January 6, 1981, filed a motion seeking dismissal because the trial court was without initial jurisdiction to entertain the claims which, as McGowan then asserted, were covered by the Act and were thereby required to be submitted to the Act's arbitration procedure. As to claims covered by the Act, § 3-2A-02 (a) provides:

> All claims, suits, and actions, including cross claims, third-party claims, and actions under Title 3 Subtitle 9 of this article [wrongful death], by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than $5,000 are sought are subject to and shall be governed by the provisions of this subtitle. *An action or suit of that type may not be brought or pursued in any court of this State except in accordance with this subtitle.* An action in which damages of $5,000 or less are sought is not subject to the provisions of this subtitle. [Emphasis added.]

"Medical injury," the term which appears both in § 3-2A-02 (a) and in the effective date clause of the Act, is defined in § 3-2A-01 (f) to mean "injury arising or resulting from the rendering or failure to render health care."

The transcript of the arguments of counsel on McGowan's motion are included in the record extract for this appeal. At that stage of the case the defendant was urging that no "medical injury" had occurred until after July 1, 1976 while the plaintiffs argued for an earlier date. Defense counsel

---

1. *See* § 6-401 (a) of the Cts. & Jud. Proc. Art. and Md. Code (1974), § 7-401 (x)(2) of the Estates and Trusts Article.

asserted that "there is no evidence whatever that the injury occurred prior to July 1, 1976" and that "all of the evidence indicate[d] that the cancer developed in late 1976 and early 1977 . . . ." Plaintiffs' counsel made two points in opposition:

1. "Mrs. Oxtoby had . . . a complete cause of action as of the time she went back [home] from George Washington University Hospital, where she had an operation to remove all of her ovaries, which was not done. Had she known this, she could have sued Dr. McGowan then and there for the cost of a second surgery abdominally to remove all of the ovarian tissue. She had a complete cause of action within a very short period of time after she was released from the hospital."

2. If "there was no complete cause of action until [Layla] developed cancer, then you would be saying that she must have developed her cancer after July 1, 1976, and the evidence in the case, while there is not strong evidence as to when it occurred, there is certainly evidence that she had cancer before that time."

The trial court denied the defense motion without stating any reasons. None of the parties requested the court to submit a special issue to the jury in order to have the jury resolve any questions of fact involved in determining when the medical injury occurred.[2]

When the verdict was in favor of McGowan, the parties switched positions on the jurisdictional issue. Plaintiffs moved for a new trial and, in the alternative, to dismiss the action without prejudice prior to the entry of judgment. As

---

**2.** Defense counsel says the purpose of the motion was to have jurisdiction raised and decided in the Maryland case so that a judgment for McGowan would be insulated from collateral attack. If there were a later suit by the plaintiffs in the District of Columbia against both the hospital and McGowan (as there apparently was), McGowan wanted the benefit of claim or issue preclusion without having to litigate in the District of Columbia whether the Maryland court had jurisdiction. The plaintiffs say that the defense motion was a "hedge" against a judgment adverse to McGowan, for use on post-trial motions and appellate review.

grounds for the latter relief plaintiffs said that the court was without jurisdiction to entertain the action. Plaintiffs conceded that the case as originally brought was within the jurisdiction of the trial court.[3] Their point was that the wrongful death and survival statute claims could not have existed until Layla's death, which occurred well after the Act had been adopted. McGowan's opposing memorandum argued, *inter alia,* that jurisdiction over the survival and wrongful death actions was based on the underlying jurisdiction over the personal injury action which had been brought before death occurred. Plaintiffs' motion to dismiss was heard on February 11, 1981. No transcript of the proceedings on that date has been furnished. The docket entries record that plaintiffs' motion was denied and judgment entered for McGowan as to Counts I through IV.[4] On this appeal plaintiffs claim that the trial court erred in denying their post-trial motion for a dismissal without prejudice.

The facts concerning plaintiffs' other appellate contentions of trial court error, in rejecting plaintiffs' post-trial motions concerning juror conduct, will be stated in Part III of this opinion.

Following the entry on April 8, 1981 of final judgment, plaintiffs moved for an order, under the recited authority of Md. Rule 1026 a 2, that the portions of the transcript which the plaintiffs would be required to file in the record for appeal be limited to the transcript of the proceedings had on January 6, 1981, when McGowan initially asserted that the

---

3. In the memorandum supporting their motion to dismiss, plaintiffs, referring to the argument on the defendant's earlier jurisdictional motion, stated that the plaintiffs "then and now contend that insofar as Layla Oxtoby was concerned, she had a complete cause of action from the moment of the incomplete surgery regardless of whether she ever developed cancer. Her medical injury, in this sense, was complete before July 1, 1976." The memorandum further stated that "[w]hen Layla Oxtoby brought her action on November 20, 1979, it was within the jurisdiction of this Court since her medical injury had occurred before July 1, 1976."

4. The declaration had been further amended to add a fifth count alleging conspiracy against McGowan with others, who were not joined as parties. The conspiracy count seems to have been severed from the trial of Counts I through IV. Summary judgment in favor of McGowan on Count V was granted on April 8, 1981.

trial court had no jurisdiction.[5] In support of their motion, plaintiffs asserted that the only issue to be raised on appeal, in addition to the juror misconduct point, would be "[w]hether [the trial court] had jurisdiction to hear a survival and wrongful death action arising from medical negligence when death occurred after July 1, 1976 . . . ." The requested order was entered. Subsequently the proceedings at the hearing of April 8, 1981, at which the juror misconduct question was argued, were transcribed and filed in the record. It further appears that counsel attempted to prepare an agreed statement of facts but that no agreement was reached.

In view of the important question concerning the scope of the Act presented by plaintiffs' appeal, we issued certiorari prior to consideration of the case by the Court of Special Appeals.

I

In their appellate brief, plaintiffs take the position that the medical injury *to Layla* occurred *after* July 1, 1976. Plaintiffs now say that they were mistaken in conceding before the trial court that Layla had a complete cause of action at the time when, as they contend, McGowan failed to

---

5. Md. Rule 1026 a 2 reads as follows:

    2. Transcript of Testimony.

    Unless a copy of the transcript of testimony is already on file, the appellant shall order in writing from the court stenographer a transcript of all the testimony, as follows: In all actions subject to Rules 1022-1024 the appellant shall order the transcript within ten days after (1) the date of the order pursuant to Rule 1024 a 1 that the appeal proceed without a prehearing conference, or (2) the date of the order pursuant to Rule 1024 b following the prehearing conference, unless a different time is fixed in that order. In all other actions the appellant shall order the transcript within ten days after filing the order for appeal. Thereafter the appellant shall promptly file the transcript with the clerk of the lower court for inclusion in the record, and shall also promptly serve a copy of such transcript upon the appellee. *Instead of serving and filing a transcript of the testimony, the parties* by written stipulation filed with the clerk of the lower court may, or *upon order of the lower court shall, file with the clerk of the lower court for inclusion in the record only such part of the transcript as* the parties or *the lower court may deem necessary for the appeal.* [Emphasis added.]

remove all of her left ovary. Plaintiffs also say that they may assert this position for the first time on appeal because it challenges the jurisdiction of the trial court over the subject matter and therefore may be raised at any time.

In our recital of the procedural background we have used the word "jurisdiction" because that was the term employed by the parties. The Act, however, does not take away the subject matter jurisdiction of a circuit court to hear and render judgments in cases involving claims which fall within the Act. "[T]his statute, which in essence requires that malpractice disputes be submitted to nonbinding arbitration" creates "a condition precedent to the institution of a court action . . . ." *Attorney General v. Johnson,* 282 Md. 274, 283-84, 385 A.2d 57, 63, *appeal dismissed,* 439 U.S. 805, 99 S. Ct. 60, 58 L. Ed. 2d 97 (1978). But the General Assembly has forcefully expressed in § 3-2A-02 (a) its intent that this condition precedent be satisfied. ("An action or suit of that type may not be brought or pursued in any court of this State except in accordance with this subtitle.") While an arbitration panel operating under the Act is not an administrative agency, *see Johnson, supra,* 282 Md. at 285, 385 A.2d at 63, the legislative mandate that the arbitration procedure under the Act be followed as a precondition to invoking the general jurisdiction of a court is analogous to the doctrine of exhaustion of administrative remedies. Where the General Assembly has provided a special form of remedy and has established a statutory procedure before an administrative agency for a special kind of case, a litigant must ordinarily pursue that form of remedy and not bypass the administrative official. *Prince George's County v. Blumberg,* 288 Md. 275, 418 A.2d 1155 (1980), *cert. denied,* 449 U.S. 1083, 101 S. Ct. 869, 66 L. Ed. 2d 808 (1981). So strong is this public policy that this Court will, *sua sponte,* vacate judgment and order an action dismissed where the litigants have not followed the special statutory procedure. *See Secretary, Department of Human Resources v. Wilson,* 286 Md. 639, 409 A.2d 713 (1979); *Commission on Medical Discipline v. Bendler,* 280 Md. 326, 373 A.2d 1232 (1977). The public policy embodied in the Act is equally as strong as

the public policy involved in the legislative creation of administrative procedures to be followed prior to invoking judicial review of agency action. Thus, the plaintiffs in this case may for the first time on this appeal adopt the position that the injury to Layla was a medical injury occurring after July 1, 1976. Compliance with the Act's precondition to court suit may not be avoided by express agreement of the parties or by mere oversight, at least prior to final judgment and final determination of all direct appeals.

While the plaintiffs' position in the trial court was that Layla's medical injury occurred prior to July 1, 1976, such was not McGowan's position prior to verdict. The issue of whether Layla's medical injury occurred prior to July 1, 1976 was decided by the trial court on McGowan's motion at the close of all of the evidence. In opposition to that motion, plaintiffs then argued that the asserted failure to remove all of Layla's ovary established a complete medical injury at that time. We need not here decide whether that analysis was the correct one. This is because the second contention advanced by the plaintiffs to the trial court at that time was that there was sufficient evidence from which it could be found that cancer had arisen in Layla prior to July 1, 1976. What in effect transpired at the argument on the defendant's motion was that the parties submitted to the trial judge the determination of any factual issues involved in ruling on McGowan's motion. The trial court ruled that the action could proceed in the circuit court. Since no party ever obtained from the trial judge a statement of his reasons for denying McGowan's motion, the ruling may well have been based on the evidence, alluded to by plaintiffs' counsel at the time, that cancer developed in Layla before July 1, 1976. Absent any record of the evidence before the trial court when it ruled, there is no way in which we can review the sufficiency of the evidence to support the trial court's determination that the case could proceed. Consequently, this Court cannot conclude that the trial court erred in proceeding further.

For purposes of considering the issue discussed in Part II,

the trial court's decision that medical injury to Layla occurred prior to July 1, 1976 stands.

## II

Plaintiffs next contend that Layla's death in June 1980 terminated any "jurisdiction" which the trial court may have possessed. The contention is that, as a matter of law, the wrongful death actions, and the personal representative's action, are for medical injuries occurring after July 1, 1976 within the contemplation of the effective date clause.

The § 3-2A-01 definition of "medical injury" tells us what "medical" means ("arising or resulting from the rendering or failure to render health care"), but it tells us only that "injury" means "injury."

Black's Law Dictionary (5th ed. 1979) defines "injury" as

> [a]ny wrong or damage done to another, either in his person, rights, reputation, or property. The invasion of any legally protected interest of another. Restatement, Second, Torts, § 7.

It is the second sentence of this definition which is the definition found in Restatement (Second) of Torts, § 7(1) (1965). Comment *a* to that section contrasts "injury" and "harm." As used in the Restatement, the invasion of a legally protected interest may be an injury, although no harm is done, *e.g.*, the nonprivileged intrusion upon land in the possession of another which constitutes no interference with, or detriment to, the land or its beneficial enjoyment. The Restatement definition is formulated because "[i]t is desirable to have a word to denote the type of result which, if the act which causes it is tortious, is sufficient to sustain an action even though there is no harm for which compensatory damages can be given." In the context of the effective date clause of the Act, the Restatement definition is inappropriate. The General Assembly obviously was not concerned with invasions of a legally protected interest which do not cause harm in the sense of "loss or detriment in fact . . . ." Restatement

(Second) Torts, § 7(2) (defining "harm"). The Act is concerned with the invasion of legally protected interests coupled with harm. A discussion of the word "injury" which more closely approximates the context in which we believe it is used in the effective date clause is found in *State ex rel. McManus v. Board of Trustees of Policemen's Pension Fund,* 138 Wis. 133, 135-36, 119 N.W. 806, 807 (1909):

> The word "injury," in ordinary modern usage, is one of very broad designation. In the strict sense of the law, especially the common law, its meaning corresponded with its etymology. It meant a wrongful invasion of legal rights and was not concerned with the hurt or damage resulting from such invasion. It is thus used in the familiar law phrase *damnum absque injuria.* In common parlance, however, it is used broadly enough to cover both the *damnum* and the *injuria* of the common law, and indeed is more commonly used to express the idea belonging to the former word, namely, the effect on the recipient in the way of hurt or damage, and we cannot doubt that at this day its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by any one.

Thus, in general, "medical injuries" as used in the effective date clause refers to legally cognizable wrongs or damage arising or resulting from the rendering or failure to render health care.

In the context of the problem presented in the instant case, there was a concurrence of an invasion of Layla's rights and of harm to Layla. If proven, that concurrence would have been a tort, actionable by Layla, and was a medical injury to her. Layla's medical injury was also alleged to have caused harm to Willard, by way of obligation for medical expense, and harm to both in their marital relationship. Layla's medical injury was said to have later caused Layla's death, with resulting harm to Willard, to the children, and to Layla's estate. Under this analysis, the invasion of Layla's interest, coupled with harm to Layla, is a common element to be

established in each of the claims asserted by the wrongful death plaintiffs and by the personal representative. From the causation standpoint, each of the surviving plaintiffs had the burden of establishing that Layla's death was due to her medical injury. One way to view the effective date clause is that the common pre-July 1, 1976 medical injury to Layla brings all of the other claims asserted here under the umbrella of a medical injury occurring before July 1, 1976. On the other hand, the wrongful death claims each assert a separate cause of action, in which the elements of Layla's death and of harm to each plaintiff occurred after July 1, 1976. Did the General Assembly intend that each such claim be treated as one for a separate medical injury under the effective date clause?

This Court has frequently said that where a statute is susceptible of more than one reasonable construction, we should apply the construction which will carry out the statute's object and purpose. *See Howard County Association for Retarded Citizens, Inc. v. Walls,* 288 Md. 526, 530, 418 A.2d 1210, 1213 (1980); *Department of State Planning v. Mayor and City Council,* 288 Md. 9, 14, 415 A.2d 296, 299 (1980); *Cider Barrel Mobile Home Court v. Eader,* 287 Md. 571, 583, 414 A.2d 1246, 1253 (1980); *Jefferson v. Jones,* 286 Md. 544, 548, 408 A.2d 1036, 1039 (1979); and *Harbor Island Marina, Inc. v. Board of County Commissioners,* 286 Md. 303, 311, 407 A.2d 738, 742-43 (1979).

Within the framework of the effective date clause, it seems clear that the intent was to make the Act prospective in operation. Section 3-2A-09 declares that

> [t]he provisions of this subtitle shall be deemed procedural in nature and shall not be construed to create, enlarge, or diminish any cause of action not heretofore existing, except the defense of failure to comply with the procedures required under this subtitle.

An effective date clause reading simply that the Act took effect July 1, 1976 might arguably have been interpreted, in light of § 3-2A-09, to make the Act's procedures apply to

pending malpractice suits which had not been tried prior to July 1, 1976, and apply to any claims not in suit by that date as well. By specifying that the new procedure applies only to medical injuries occurring after the effective date, the General Assembly contemplated that that standard could be applied to medical malpractice actions filed in court after July 1, 1976. There is at least an implication that a litigation package, filed after July 1, 1976, in which multiple claims were joined because of a common question of law and fact involving a medical injury antedating July 1, 1976, could be treated as a unit and proceed in court as such. For example, if one spouse suffered a medical injury in late June of 1976, but the other spouse did not contractually incur any obligation to expend funds for treatment of that medical injury until after July 1, 1976, it would seem to be more reasonable to allow the two claims to proceed in court in one suit, than to sever the medical expense claim of one spouse for arbitration and to retain only the other spouse's claim in court.

The Court of Special Appeals has had occasion to apply the effective date clause in cases presenting the single claim of the patient. In one case, the defendant diagnosed incurable cancer on March 23, 1976, when in fact there was no cancer. The patient underwent chemotherapy from March 23 to April 27, 1976 and continued office visits for blood tests by the defendant physician through August 3, 1976. The misdiagnosis was discovered September 8, 1976 which led to suit being filed directly in circuit court. On appeal from a judgment against him, the physician contended that the matter should have been submitted to arbitration. The court held that the harm was done and the medical injury had occurred prior to the effective date of the Act and that it was irrelevant that the effects of the medical injury continued to be felt by the patient thereafter. *Dennis v. Blanchfield*, 48 Md. App. 325, 428 A.2d 80 (1981), *aff'd in part and modified on other grounds*, 292 Md. 319, 438 A.2d 1330 (1982). In another case the patient claimed negligence by hospital agents through their failure, in January 1971, to diagnose his hip injury as an undisplaced fracture and in assuring him, in December 1973, that he would not develop a bone

disease. Actually the patient had a condition of bone deterioration resulting from a disruption of the blood supply to his right femoral head. Chronic pain developed in the hip in the late summer of 1977. Suit was filed directly in circuit court. It was held that the medical injury occurred prior to July 1, 1976. *John Hopkins Hospital v. Lehninger,* 48 Md. App. 549, 429 A.2d 538 (1981). These cases stand for the proposition that a medical injury occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date.

In the instant case, one of the amended declaration counts against McGowan is that of Layla's estate. That count asserts Layla's surviving claim for medical injury to her, which, on the record before us, is to be taken as a pre-July 1, 1976 medical injury to Layla. The estate in that count also seeks reimbursement for funeral expenses which were not incurred until after July 1, 1976. We agree with the approach taken by the Court of Special Appeals in the *Blanchfield* and *Lehninger* cases, both *supra.* The fact that some of the monetary compensation sought by Layla's estate was for harm arising after July 1, 1976 does not make the count brought by Layla's estate subject to arbitration.

As to the wrongful death claims, the plaintiffs cite *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 65 A. 49 (1906) for the proposition that a wrongful death action is a separate cause of action from one under the survival statute. Thus, plaintiffs say that the wrongful death actions here are to be viewed as based on separate medical injuries, occurring upon Layla's death, and must be arbitrated. In order to test this interpretation, we shall ignore the fact that a judgment has been rendered in favor of the defendant on the estate's claim which was properly before the court. Instead we shall consider the problem of where the wrongful death claims should initially proceed as of the time immediately following Layla's death. The result of plaintiffs' interpretation would have been that one of the claims arising out of the alleged medical malpractice — the estate claim — would be determined judicially, while the other claims involving the same

alleged malpractice would be split off from the court suit, undergo arbitration, and then potentially return to court at a later time. In cases like that at hand, both the plaintiffs and the defendant would have to endure the expense of concurrently litigating common questions in two different forums. Such a result violates one of the principal purposes of the Act.

One object of the Act, and of similar statutes passed in other states in the period of the medical malpractice insurance "crisis," was to reduce the cost of handling claims, particularly from the insurer's standpoint. In a discussion of that subject, the Report to the President of the Senate and to the Speaker of the House by the Medical Malpractice Insurance Study Committee, which underlies the 1976 adoption of the Act, states (p. 8):

> From an economic point of view, the more serious problem is in the cost of defending claims. According to the testimony of St. Paul Fire & Marine Insurance Company, that company estimated that for every dollar set aside for loss reserves, an additional 50 cents was set aside for the loss adjustment expense, i.e., the cost of processing and defending the claims. Thus, approximately 1/3 of the total reserve for losses was attributable to this expense, a large part of which was for attorney's fees and reimbursable expenses of defense counsel.[6]

And *see* Abraham, *Medical Malpractice Reform: A Preliminary Analysis,* 36 Md. L. Rev. 489 (1977); Comment, *An Analysis of State Legislative Responses to the Medical Malpractice Crisis,* 1975 Duke L.J. 1417; McGuirk and Rafferty, *Medical Malpractice and the Maryland Legislature,* 6 Md. L. Forum 9, 15 (1976); Quinn, *The Health Care Malpractice Claims Statute: Maryland's Response to the Medical Mal-*

---

**6.** In Attorney General v. Johnson, *supra,* the trial court concluded "that a claimant's costs would be substantially increased if the case were brought to court after arbitration, and reduced if the arbitration award were accepted." 282 Md. at 281, 385 A.2d at 61.

*practice Crisis,* 10 U. Balt. L. Rev. 74, 76 (1980); Note, *Medical Malpractice Arbitration: Time for a Model Act,* 33 Rutgers L. Rev. 454 (1981); Comment, *The Constitutionality of Medical Malpractice Mediation Panels: A Maryland Perspective,* 9 U. Balt. L. Rev. 75 (1979).

For the limited purpose of applying the effective date clause of the Act, we hold that where a medical injury has occurred to the patient prior to July 1, 1976, wrongful death actions based on the patient's death as a result of that medical injury are not subject to the Act, regardless of when death occurs. Consequently, the trial court did not err in denying the plaintiffs' motion to dismiss their case.

## III

We turn now to the plaintiffs' issues involving the jury's deliberations. It is asserted that the verdict was the product of coercion and that one of the jurors brought a medical dictionary or anatomy book, which was not a trial exhibit, into the jury room.

Coercion of one or more jurors by other jurors was first raised by the plaintiffs in their motion for a new trial. An affidavit of plaintiffs' counsel presented the following as the factual basis for the motion:

> [A]t approximately 6:10 p.m. on the evening of the verdict Plaintiff's counsel was in the courtroom for a brief period. During that time the jurors were engaged in loud, angry exchanges of personal invective. The exchanges were very violent. A loud male voice could be heard shouting, with a female response, "Don't you shout at me." And the male voice responding, "I will shout at you." A juror was accused of lying. Another was accused of being influenced by something involving the presence of a relative in court. Comments upon what the Judge said and upon counsel were heard. All of this occurred in a rapid and violent fashion. Every word could be clearly heard even though those in the

courtroom were trying not to overhear the exchanges. At this point Plaintiffs' counsel felt it more appropriate that he leave rather than continue to be within earshot of the jury exchanges.

The verdict was returned 20 to 30 minutes later.

Also tendered by the plaintiffs, but apparently withdrawn, was the affidavit of juror No. 9 which was filed on February 9, 1981, two days before the new trial motion was heard and denied. A motion *ne recipiatur* was filed by the defendant to that affidavit. There is no transcript of the proceeding on the new trial motion. However, the transcript of a later argument, heard on April 8, reflects that the plaintiffs, at the time of argument on the new trial motion, had agreed with the defendant's position that the juror affidavit was "improper evidence."

The issue is whether the trial court abused its discretion in denying the motion for new trial. *Braun v. Ford Motor Co.,* 32 Md. App. 545, 548-49, 363 A.2d 562, 564-65 (1976). Counsel's affidavit does not compel the conclusion that any juror was coerced into the verdict. There was no abuse of discretion.

On March 6, 1981 plaintiffs moved to vacate the judgments which had been entered on February 11 as to Counts I through IV. That motion recited it was made under Md. Rule 625 a.[7] The motion was accompanied by the affidavits of jurors Nos. 3 and 9 which stated that a third juror had brought a medical book into the jury room where it was examined by some of the jurors.[8] Subsequently juror No. 3

---

7. Md. Rule 625 a provides:

> For a period of thirty days after the entry of a judgment, or thereafter pursuant to motion filed within such period, the court shall have revisory power and control over such judgment. After the expiration of such period the court shall have a revisory power and control over such judgment, only in case of fraud, mistake or irregularity.

We intimate no opinion as to whether it was necessary to invoke Rule 625 a when there was no final judgment in the action.

8. At the hearing on this motion plaintiffs' counsel argued that there was prejudice because the jurors were probably tracing an anatomical path de-

made an affidavit that she had been verbally abused by other jurors during the jury deliberations and that her assent to the verdict was the product of that intimidation. This precipitated another argument by the plaintiffs on the issue of juror coercion. McGowan moved that the affidavits not be received and his motion was granted on April 8. Plaintiffs' motion to vacate was denied. On this appeal plaintiffs do not ask us to order the judgment vacated, but only to remand, without affirmance or reversal, for the purpose of having the trial court consider the juror affidavits. We will not do so.

Regardless of the rule in other jurisdictions, in Maryland it is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Christ v. Wempe*, 219 Md. 627, 641, 150 A.2d 918, 925 (1959); *Williams v. State*, 204 Md. 55, 102 A.2d 714 (1954); *Kelly v. Huber Baking Co.*, 145 Md. 321, 125 A. 782 (1924); *Brinsfield v. Howeth*, 110 Md. 520, 73 A. 289 (1909); *Browne v. Browne*, 22 Md. 103 (1864); *Bosley v. The Chesapeake Insurance Co.*, 3 G. & J. 450 (1831) (note); *Braun v. Ford Motor Co., supra*, 32 Md. App. 545, 363 A.2d 562.

Plaintiffs urge that the rule against juror impeachment of the verdict should be relaxed where there is also evidence of jury misconduct which is independent of the jurors themselves — here counsel's affidavit of shouting in the jury room and the fact that some of the jurors were observed to be crying when the verdict was returned. This contention is contrary to *Christ v. Wempe, supra.* There an affidavit of a court clerk was used in support of a motion for new trial. The affidavit stated that the forelady of the jury had come out of the jury room, asked the clerk, out of the presence of the court and counsel, a question concerning the interelationship of special issues submitted to the jury and

---

scribed in defense testimony. It seems the defense presented expert opinion that the cancer originated in a part of the abdomen other than an ovary remnant and spread to the area adjacent to the site from which the left ovary was said to have been fully removed.

that the clerk had answered the question. At the hearing on the new trial motion, counsel for the movant sought to question each juror as to what the forelady had been instructed to ask "the court" and what she said the reply was. This examination was not permitted. We affirmed. The proffered testimony of what took place in the jury room was properly not received, even though the clerk's affidavit was considered and, on the facts there, held insufficient to require a new trial.

In the instant case the trial court did not err in granting the motion *ne recipiatur* as to the juror affidavits.

> *Judgment of the Circuit Court for Montgomery County affirmed. Appellants to pay the costs.*