SALMON, J.
 

 This case requires us to construe and apply section 3-2A-04(b) of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland (1973, 2002 RepLVol.).
 
 [1]
 
 Section 3-2A-04(b) reads, in pertinent part:
 

 (b)
 
 Filing and service of certificate of qualified
 
 expert.— Unless the sole issue in the claim is lack of informed consent:
 

 (l)(i) Except as provided in subparagraph (ii) of this paragraph, a claim filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant fails to file a
 
 certificate of a qualified expert with the Director attesting
 
 
 *634
 

 to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, unthin 90 days from the date of the complaint.
 
 The claimant shall serve a copy of the certificate on all other parties to the claim or their attorneys of record in accordance with the Maryland Rules.
 

 (ii) In lieu of dismissing the claim, the panel chairman shall grant an extension of no more than 90 days for filing the certificate required by this paragraph, if:
 

 1. The limitations period applicable to the claim has expired; and
 

 2. The failure to file the certificate was neither willful nor the result of gross negligence.
 

 (2) A claim filed after July 1, 1986, may be adjudicated in favor of the claimant on the issue of liability, if the defendant disputes liability and fails to file a certificate of a qualified expert attesting to compliance with standards of care, or that the departure from standards of care is not the proximate cause of the alleged injury, within 120 days from the date the claimant served the certificate of a qualified expert set forth in paragraph (1) of this subsection on the defendant. If the defendant does not dispute liability, a certificate of a qualified expert is not required under this subsection. The defendant shall serve a copy of the certificate on all other parties to the claim or their attorneys of record in accordance with the Maryland Rules.
 

 (3) The attorney representing each party, or the party proceeding pro se,
 
 shall file the appropriate certificate with a report of the attesting expert attached.
 
 Discovery is available as to the basis of the certificate.
 

 (Emphasis added.)
 

 Maryland’s Health Care Malpractice Claims Statute (“the Statute”) requires “that a person with a medical malpractice claim[
 
 2
 
 ] first file that claim with the Director of
 
 *635
 
 Health Claims Arbitration Office (‘HCAO’).” § 3-2A-04(a).
 
 McCready Mem’l Hosp. v. Hauser,
 
 330 Md. 497, 501, 624 A.2d 1249 (1993). In
 
 McCready,
 
 the Court of Appeals interpreted section 3-2A-04(b)(l)(i) as requiring that within ninety days of the filing of a medical malpractice claim “the plaintiff must file a certificate of qualified expert (expert’s certificate) attesting to
 
 a defendant’s departure from the relevant standards of care
 
 which proximately caused the plaintiffs injury.”
 
 Id.
 
 (emphasis added). With exceptions not here relevant, the statute also requires that “the HCAO dismiss, without prejudice, any claim where the plaintiff fails to file an expert’s certificate within 90 days.”
 
 Id.
 

 In the case
 
 sub judice,
 
 the medical malpractice claimants filed suit in the HCAO, naming thirty-one defendants. Their claims were accompanied by certificates from two qualified experts. The certificates, however, did not say that any of the thirty-one defendants either departed from the standard of care or that the departure from the standard of care by any of the defendants was the proximate cause of the injuries alleged. Moreover, the certification filed with the HCAO did not have attached a report from the expert, as required by section 3-2A-04(b)(3).
 

 After service, several of the defendants filed a certificate of their own qualified expert. Thereafter, pursuant to section 3-2A-06B(c), those defendants waived arbitration.
 
 [3]
 
 The filing of that waiver had the effect of transferring plaintiffs’ claims against all defendants to the Circuit Court for Baltimore City. Thereafter, all defendants filed motions for summary judg
 
 *636
 
 ment in which they alleged that the plaintiffs’ failure to comply with the requirements of section 3-2A-04(b) warranted a dismissal of the circuit court action.
 

 The Circuit Court for Baltimore City, after a hearing on the matter, dismissed all plaintiffs’ claims against all defendants, without prejudice.
 

 One question is presented for our review:
 

 Did the motions court err in granting appellees’ motion to dismiss on the basis that the appellants failed to comply with section 3-2A-04 of the Courts and Judicial Proceedings Article?
 

 I.
 
 BACKGROUND FACTS
 

 The core of the problem that gives rise to this appeal concerns the contents of the two certificates filed by appellants’ experts. The captions to both certificates are identical and read as follows:
 

 MICHAEL D’ANGELO, Personal Representative of the Estate of VINCENT D’ANGELO Claimant vs. ST. AGNES HOSPITAL Health Care Providers
 

 Appellants’ statement of claims was accompanied by a certificate signed by Dr. Craig Bash, which read:
 

 I, Craig N. Bash, M.D., M.B.A. do hereby certify that I am a licensed doctor in the specialty of Neuroradiology.
 

 I do further hereby certify that less than twenty-percent (20%) of my professional activities are devoted to activities that directly involve testimony in personal injury claims.
 

 I do further hereby certify that I have reviewed the medical records and films of
 
 Health Care Providers named in this claim, pertaining to the care and treatment rendered to Vincent D’Angelo from St. Agnes Hospital.
 

 
 *637
 
 Based upon my training, expertise and review, I have concluded that
 
 the fore,going medical providers failed to comply with the standards of care and that such failure was the proximate cause of the injuries to Claimant, Vincent D’Angelo.
 

 (Emphasis added.)
 

 Dr. John C. Schaefer, who is Board certified as an internist and as a specialist in infectious disease, also filed a “Certificate of Qualified Expert.” His certifícate was identical to that filed by Dr. Bash, with one exception. The first sentence in Dr. Schaefer’s certificate replaced the first sentence found in Dr. Bash’s certifícate and read: “I, John C. Schaefer, M.D., do hereby certify that I am a licensed doctor in the specialty of Infectious Disease.”
 

 The defect common to both certificates is that the certifying doctors said that they had “concluded that the
 
 foregoing
 
 medical providers failed to comply with the standard of care and that such failure was the proximate cause of the injuries to Claimant, Vincent D’Angelo.” But there is nothing in the certificate to indicate the identity of the health care providers who the experts believed rendered substandard care. A related problem is that the certificates said that each expert had “reviewed the medical records and films of the Health Care Providers named in this claim,” even though it was later learned that when the certificates were executed the certifying experts did not know the identity of
 
 any
 
 of the health care providers who were going to be named by plaintiffs’ counsel in the HCAO suit. Moreover, “St. Agnes Hospital,” which is mentioned in the caption of both certificates, is
 
 not
 
 named as a defendant in the statement of claims later filed by appellants. Instead, Sterling Professional Emergency Physicians, LLC; St. Agnes Healthcare, Inc.; and twenty-nine Maryland doctors were named.
 

 One of the plaintiffs in the suit filed with the HCAO is Michael D’Angelo, who brought a survivorship claim against the defendants in his capacity as Personal Representative of the Estate of Vincent S. D’Angelo. Additional plaintiffs were
 
 *638
 
 various relatives of Vincent S. D’Angelo, who brought wrongful death actions against the thirty-one defendants. The twenty-nine medical doctors sued by the plaintiffs were: Sambandam Baskaran, David B. Bullis, Phillip E. Byrd, Joseph Ciacci, Enzo Cosentino, David Elder, Elie K. Fraiji, Elizabeth A. Frankel, Theodore E. Harrison, Michelle A. Henggeler, Rus Horea, Radu S. Iancovici, Bijan Keramati, Chang W. Kang, U.D. King, Jr., Anthony Martinez, Antonio B. Martins, Sanford D. Minkin, Joseph Moran, Jose F. Morelos, Kartchik Muthasamy, Myung H. Nam, Pedro P. Purcell, Lyle T. Saylor, Kevin H. Scruggs, Henry M. Shuey, Jr., Sharon E. Silverman, Michael A. Silverman, and Donal K. Walshe.
 

 II.
 
 ALLEGATIONS IN THE STATEMENT OF CLAIMS
 

 The claimants alleged that in November 1998 Vincent D’Angelo (hereafter “Mr. D’Angelo”) began suffering excruciating headaches. He was initially evaluated by his primary care physician, Chang W. Kang, M.D. Between January 13, 1999, and June 14, 1999, Mr. D’Angelo sought evaluation and treatment for his headaches (and related conditions) at St. Agnes Hospital, where he was treated by agents of St. Agnes Healthcare, Inc., and/or St. Agnes Community Care Center. CT scans were read as normal by various defendants, even though, according to the complaint, Mr. D’Angelo continued to experience clinical symptoms suggestive of an ongoing infectious process in his sinus cavity.
 

 On June 15, 1999, Mr. D’Angelo once again visited the emergency room of St. Agnes Hospital. This time he was in a severely compromised mental state. A CT scan was performed the next day, which was interpreted as demonstrating findings consistent with a subdural empyema—an infectious mass that had penetrated the sinus cavity and invaded the brain. By June 16, 1999, Mr. D’Angelo was suffering from profound infection, which caused his brain to shift.
 

 Mr. D’Angelo underwent a craniotomy to evaluate the infection on June 16, 1999. Between the date of the craniotomy and March 6, 2001, Mr. D’Angelo suffered excruciating head
 
 *639
 
 aches, blindness, and other severely debilitating health problems. He died on March 6, 2001, at age forty-four.
 

 The allegations of negligence, as against the twenty-nine doctors, were general in nature,
 
 viz:
 

 16. The [djefendants named in paragraph 15 above [the 29 doctors named as defendants] owed the duty to exercise the degree of care, skill and judgment expected of competent medical practitioners acting in the same or similar circumstances, which duty included performance of adequate and proper diagnostic procedures and tests to determine the nature and severity of [pjlaintiffs condition, careful diagnosis of such condition, employment of appropriate procedures, surgery and/or treatment to correct such conditions without injury upon the [pjlaintiffs [sic], continuous evaluation of [pjlaintiffs condition and the effects of such treatment, adjustment of the course of treatment in response to such ongoing surveillance and evaluation, and adherence to those policies and procedures governing the treatment of the [pjlaintiff and supervision of those physicians over whom said [djefendants were responsible.
 

 17. Those [djefendants identified in paragraph 15 were negligent in that they failed to employ appropriate treatment, surgery, tests and/or procedures, failed to carefully and thoroughly evaluate the [pjlaintiffs condition, failed to properly and appropriately diagnose the [pjlaintiffs condition, failed to thoroughly evaluate the effects and results of any tests and/or procedures performed, failed to properly evaluate the effects of chosen treatment, failed to adjust the [pjlaintiffs treatment in response to appropriate evaluation of the effects of treatment, failed to properly monitor the course of the [pjlaintiffs condition and treatment, failed to employ adequate and proper diagnostic procedures and/or tests to determine the nature and extent of the [pjlaintiffs condition, failed to follow those policies and procedures for the treatment of the [pjlaintiff and the supervision of resident doctors over whom they were responsible.
 

 
 *640
 
 The allegations against St. Agnes Health Care, Inc., and Sterling Professional Emergency Physicians, LLC, were similar to those as against the twenty-nine doctors.
 

 III.
 
 POST-FILING DEVELOPMENTS
 

 Defense counsel, on September 30, 2002, deposed Dr. Schaefer, the infectious disease expert who had signed one of the certificates filed with the HCAO.
 

 Dr. Schaefer said in his deposition that he signed the certificate on April 24, 2002, which was approximately six weeks before the statement of claims was filed with the HCAO. At the time he signed the certificate, he did not know the identity of the health care providers against whom the certificate was to be used.
 

 Dr. Schaefer conceded at deposition that he was neither retained nor qualified to express opinions relative to errors in the interpretation of Mr. D’Angelo’s CT scans. He nevertheless testified that at the time he signed the certificate he intended that his certificate was to apply against the radiologist who read the June 14,1999, CT scan and no one else. As of April 24, 2002 (the date he signed the certificate), he had no opinion regarding the care rendered by health care providers who treated Mr. D’Angelo prior to or after June 14,1999. Dr. Schaefer based his opinion that the June 14 CT scan had been misread upon a report dated February 15, 2002, signed by Dr. Craig N. Bash.
 

 Although claimants had filed suit against Dr. Donal K. Walshe and Dr. Pedro P. Purcell, Dr. Schaefer praised the care rendered by Dr. Walshe and said that he had no criticism of Dr. Purcell’s performance. Dr. Schaefer expressed no opinion in regard to the care by twenty other doctors who were named in the lawsuit, but he did express an adverse opinion as to several of the other defendants.
 

 Dr. Bash’s deposition was commenced on October 2, 2002. At the time of his deposition, Dr. Bash could not remember what records he had reviewed prior to February 15, 2002, which was the date he signed the certificate. Moreover, when
 
 *641
 
 he signed the certificate, he did not know who was going to be named in the statement of claims. Like Dr. Schaefer, he did remember reviewing the decedent’s June 14 CT scan. In his opinion, that CT scan had been misread by one of the radiologists at St. Agnes.
 
 [4]
 

 Among the records Dr. Bash brought with him to the deposition was a report he had written to counsel for the plaintiffs. This report was dated February 15, 2002, like his certificate. The report read:
 

 At your request I have reviewed this patient’s CT scans and medical records.
 

 I disagree with the two CT reports of 14 June 1999 which state “... no acute process identified ...” because the CT scan of 14 June 1999 documents the following additional acute pathologic processes:
 

 1. Increased density in the right frontal sinus with air fluid level consistent with acute sinusitis.
 

 2. Increased densities in the right ethmoid, maxillary and sphenoid sinuses consistent with either an acute or chronic pan-sinusitis.
 

 3. Loss of normal sulci in right frontal lobe consistent with either isodense subdural collection (abscess given the association with sinusitis) or local gyral cerebral edema secondary to cerebritis.
 

 Early infectious disease consultation and antibiotic treatment on 14 June 1999 was indicated because the patient had an abnormal head (miss-read on 14 June 1999) CT scan suggestive of intracranial abscess/cerebritis, increased white count of 14.9 per St. Agnes ER report, headache, and vomiting. Early treatment of intracranial infectious processes improves prognosis as supported by Mandell. . . . [
 
 5
 
 ]
 

 
 *642
 
 An infectious disease specialist did not get involved until 16 June 1999 which in my opinion was an inappropriate delay.
 

 As to many of the doctors named in the lawsuit, Dr. Bash did not voice any opinion. As to others, he opined that they had deviated from the appropriate standard of care, by, for example, misreading the June 14,1999, CT scan.
 

 Dr. Bash’s deposition was continued to a later date because some of the defense lawyers involved in the case had no opportunity to examine him. Subsequent to the deposition, Dr. Bash suffered a severe head injury and was unable to participate further in the case. For that reason, his deposition was never resumed.
 

 On October 7, 2000, which was five days after Dr. Bash’s deposition, Drs. Bullís, Scruggs, Frankel, Henggeler, Harrison, Martins, Michael Silverman, and Sterling Professional Emergency Physicians, LLC, jointly filed a waiver of arbitration, pursuant to section 3-2A-06B(c). An order of transfer was issued by the director of the HCAO on November 1, 2002, and the entire case was transferred to the Circuit Court for Baltimore City. Thereafter, the plaintiffs filed a complaint in the circuit court, which was, in substance, identical to the one they had filed with the HCAO.
 

 Between April 29 and May 19, 2003, all defendants either filed individually, or joined in, motions to dismiss the case or, in the alternative, for summary judgment as to plaintiffs’ claims. Some, but not all, defendants asserted, based on the depositions of Drs. Bash and Schaefer, that plaintiffs could not prove that they deviated from the appropriate standard of care. All defendants maintained that the certificate of Drs. Schaefer and Bash were deficient because the certifying physicians failed to state that
 
 any
 
 of them violated the standard of care in treating defendants. In this regard, movants argued that the
 

 obvious purpose of the certificate requirement is to prevent frivolous malpractice claims from going forward. Though effectively a screening process, the filing of a certificate that complies with the statutory requirement has repeatedly
 
 *643
 
 been deemed by Maryland’s courts to be an “indispensable step” in the process of litigating a medical malpractice claim.
 

 In opposition to the dismissal motions, counsel for the plaintiffs contended,
 
 inter alia,
 
 that
 

 a strict reading of section 3-2A-04(b)(l) suggests that the [certifying] expert is not required to identify each and every defendant and requires only that he certify (a) breach of the standard of care and causation, thus demonstrating negligence in the rendering of health care.
 

 Plaintiffs’ counsel also opposed the dismissal motions on the basis that the “case law interpreting the appropriateness of dismissal of a case filed under the [Health Claims Arbitration] Act for failure to arbitrate has focused on whether the claimant failed to make a good-faith effort at arbitration” and not on whether there had been technical compliance with the certificate requirement. (Citing
 
 Manzano v. S. Md. Hosp. Inc.,
 
 347 Md. 17, 698 A.2d 531 (1997), and
 
 Karl v. Davis,
 
 100 Md.App. 42, 46, 639 A.2d 214 (1994).) Plaintiffs maintained that they had at all times acted in good faith in filing the certificates and in prosecuting their claims.
 

 Plaintiffs further contended that the experts’ certificates clearly applied “to the claims against St. Agnes Hospital [which] is named in the caption and is, upon information and belief, vicariously liable for the alleged acts or omission of many of the [d]efendants named in the Complaint.”
 

 A hearing on the motions to dismiss and/or for summary judgment was held on May 30, 2003. Prior to the hearing, the plaintiffs dismissed, vrith prejudice, their claims against Drs. Cosentino, Iancovici, Morelos, and Walshe. Plaintiffs also dismissed their suit, albeit without prejudice, against Drs. Ciacci and Shuey. Therefore, at the time of the hearing, twenty-five defendants remained.
 

 Counsel for the plaintiffs argued at the hearing that the sole purpose of the expert certification requirement is to place the defendants on notice. In response to this assertion, the motions judge asked: “How do you place them on notice when
 
 *644
 
 you don’t name them?” Counsel, in response, acknowledged that the certifícate did not name the individual defendants but asserted that the statute did not require that the certificate name each health care provider listed in the statement of claims as a defendant.
 

 The motions judge also asked plaintiffs’ counsel why his clients did not simply sue the health care providers who they knew had violated the standard of care and then, if discovery uncovered malpractice by others, add those negligent health care providers as defendants. In the words of the motions judge, “Why didn’t [plaintiffs’ counsel] start small and work up?” Counsel for the plaintiffs responded:
 

 Well, we took the opposite approach, which was that we had some time. We wanted to find out what we could find out
 
 and then we would get rid of people.
 
 But we didn’t want to start small, because of the process of discovery, the number of people that were still going to be involved in this case, naming just people whose names—or the ordering, or the interpreting doctors on CT films, which is not the entire issue. There were primary care doctors, there were ER doctors.
 

 But clearly in this case, we didn’t look at it as being a significant time-saving effort to start small and to add.
 
 We viewed this as being a better opportunity to learn what we eould preliminarily, and dismiss people from the case as was appropriate, which we have, as I’ve indicated. We’ve dismissed a number of people from the case.
 

 We
 
 are not here to abuse the process, we’re just here to learn what we need to learn....
 

 (Emphasis added.)
 

 On May 30, 2003, the motions judge signed an order dismissing, without prejudice, the case as to all remaining defendants due to the plaintiffs’ failure to file “a certificate of qualified merit that complies with § 3-2A-04(b)(l) of the
 
 *645
 
 Courts and Judicial Proceedings Article.” This timely appeal followed.
 
 [6]
 

 IV.
 
 ANALYSIS
 

 The Maryland Health Claims Malpractice Act (“the Act”) requires, with exceptions not here relevant, arbitration as a condition precedent to the initiation of a medical negligence suit in circuit court.
 
 See
 
 §§ 3-2A-01 to 3-2A-09.
 
 See also Manzano,
 
 347 Md. at 22-23, 698 A.2d 531. As part of the arbitration process, the claimant must file a certificate of a qualified expert within ninety days of the filing of the statement of claims unless the plaintiff obtains an extension for good cause shown.
 
 McCready Mem’l Hosp., supra,
 
 330 Md. at 501, 624 A.2d 1249. Besides filing an expert’s certificate, a claimant is also required to file with the certificate “a report of the attesting expert.” § 3-2A-04(b)(l )(3).
 

 The obvious purpose of the certificate requirement reflects the General Assembly’s desire to weed out, shortly after suit is filed, nonmeritorious medical malpractice claims. The certificate of a qualified expert is an “indispensable step” in the arbitration process.
 
 McCready Mem'l Hosp.,
 
 330 Md. at 512, 624 A.2d 1249. Tt is so important that, if the certificate requirement is not followed, a circuit court action will be dismissed,
 
 sua sponte. Oxtoby v. McGowan,
 
 294 Md. 83, 91, 447 A.2d 860 (1982). And, failure to file a proper certificate is tantamount to not having filed a certificate at all.
 
 See Watts v. King,
 
 143 Md.App. 293, 307-10, 794 A.2d 723 (2002).
 

 Appellants first argue that they were not required to file a certificate saying who violated the appropriate standard of care or whose action (or inaction) proximately caused medical injury. Although they do not say so specifically, they apparently interpret the Act as requiring the expert to certify
 
 *646
 
 that someone (as yet unknown) breached the applicable standard and that someone’s deviation from the appropriate standard of care proximately caused medical injury. If such an interpretation were sanctioned, the certifícate requirement would amount to a useless formality that would in no way help weed out nonmeritorious claims.
 

 At the time plaintiffs filed their certificates, it was well established that the certifying doctor was required to say that he or she was of the opinion that the
 
 defendants,
 
 who were named in the complaint, deviated from the applicable standard of care and that the deviation proximately caused the plaintiffs injury. This was made crystalline in
 
 McCready, supra,
 
 which was decided in 1993. The
 
 McCready
 
 Court said:
 

 In 1976, the General Assembly enacted the Health Care Malpractice Claims Statute (the Statute) in response to explosive growth in medical malpractice claims and the resulting effect on health care providers’ ability to obtain malpractice insurance. “[T]he general thrust of the Act [is] that medical malpractice claims be submitted to arbitration as a precondition to court action” where the potential claim exceeds the [District [C]ourt’s concurrent jurisdiction.
 
 Attorney General v. Johnson,
 
 282 Md. 274, 278-79, 385 A.2d 57, 60 (1978);
 
 see also Oxtoby v. McGowan,
 
 294 Md. 83, 91, 447 A.2d 860, 865 (1982); Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Article, § 3-2A-02(a). The basic procedures for initiating and maintaining a claim under the Statute are clear and simple. The Statute requires that a person with a medical malpractice claim first file that claim with the Director of the Health Claims Arbitration Office (HCAO). § 3-2A-04(a). Thereafter, the plaintiff must file , a certificate of qualified expert (expert’s certificate)
 
 attesting to a defendant’s departure from the relevant standards of care which proximately caused the plaintiffs injury.
 
 § 3-2A-04(b)(l)(i). In general, the Statute mandates that the HCAO dismiss, without prejudice, any claim where the plaintiff fails to file an expert’s certificate within 90 days, § 3-2A-04(b)(l)(i), unless the plaintiff obtains one of three statutory extensions of the time to file
 
 *647
 
 an expert’s certificate: § 3-2A-05(j), and § 3-2A-04(b)(1)(H).
 

 McCready,
 
 330 Md. at 500-01, 624 A.2d 1249 (some alterations in original) (some citations omitted) (footnotes omitted) (emphasis added).
 

 In
 
 Witte v. Azarian,
 
 369 Md. 518, 521, 801 A.2d 160 (2002), the Court of Appeals reiterated that the General Assembly in 1986 amended the Health Claims Arbitration Act
 

 to require that unless, within 90 days after the filing of the claim, the claimant files with the HCAO a certificate of a qualified expert attesting
 
 that the defendant’s conduct constituted
 
 a departure from the standard of care and that the departure was the proximate cause of the alleged injury, the claim must be dismissed with prejudice.
 

 (Emphasis added.)
 

 We reached a similar conclusion in
 
 Watts v. King, supra,
 
 143 Md.App. at 306, 794 A.2d 723, where Judge Kenney, for the Court, said: “A claimant is required to file a certificate of a qualified expert attesting that the
 
 licensed professional against whom the claim was filed
 
 breached the standard of care. CJ § 3-2A-04(b)(l)(i).” (Emphasis added.)
 

 For the foregoing reasons, we reject appellants’ contention that the expert’s certificate need not name the licensed professional against whom the claims are brought.
 

 Appellants also contend that it “is uncontroverted from the record that St. Agnes Healthcare, Inc., was identified within the certificate as having breached the standard of care.” In fact, the record shows the reverse. St. Agnes Healthcare, Inc., was mentioned in neither certificate.
 

 The appellants’ principal argument is that, even if the certificates filed were technically deficient, the claims nevertheless should not have been dismissed because the record below “reflects clearly that (ajppellants attempted to arbitrate their claim in good faith and in accordance with the Act.” In support of this argument, appellants contend:
 

 
 *648
 
 Despite the infirmity with the language within the [certificate, the opinion evidence [ajppellees received during the four months following the filing of the [cjertificates on the various bases of their potential culpability for medical negligence was more than sufficient to satisfy the letter and spirit of the certification requirement of the Act.
 

 We disagree with the contention that “the letter and the spirit” of the certificate requirement was fulfilled within four months of the filing of the statement of claims. The depositions of appellants’ expert witnesses disclosed that the experts signed the certificates without any inkling as to whom appellants’ attorney planned to sue. Discovery also made it clear that almost all of the appellees were sued even though no doctor had
 
 ever
 
 expressed the view that they had deviated from the appropriate standard of care.
 

 And, at the time of the motions hearing, which took place about ten months after the HCAO claims were filed, appellants’ counsel was still unable to tell the motions judge the basis for the contention that many of the remaining twenty-five defendants had acted negligently in their treatment of Mr. D’Angelo. The approach defendants utilized (“Sue first and find out who is liable later”) was not within either the “letter” or “spirit” of the certificate requirement.
 

 But, even if we agreed with appellants that they had made a “good faith” effort to comply with the certificate requirement, we fail to see how proof of such an effort would warrant a reversal. As has been shown, filing of a certificate meeting the requirements of section 3-2A-04(b) is a condition precedent that must be met before a claimant can proceed in circuit court with a suit against a named defendant. The case of
 
 Watts, supra,
 
 illustrates this point.
 

 In
 
 Watts,
 
 a certificate was filed with the HCAO, but the certificate did not “attest to a deviation from the standard of care” by one the defendants, Dr. Richard Watts, or Dr. Watts’s co-defendant, Watts Dental Associates, P.C., nor did the certificate show “that any deviation was the proximate cause of the alleged injury.” 143 Md.App. at 295, 309, 794
 
 *649
 
 A.2d 728. Due to this deficiency, the HCAO dismissed the plaintiffs case.
 
 Id.
 
 at 295, 794 A.2d 723. In
 
 Watts,
 
 the central question presented was:
 

 If a dental malpractice claim is dismissed by the HCAO ... for failure to file a satisfactory certificate of qualified expert, has that claim been “arbitrated” as required by the Health Care Malpractice Claims Act?
 

 Id.
 
 at 295, 794 A.2d 723.
 

 That question was answered in the negative,
 
 viz:
 

 We equate King’s failure to file a certificate that meets the statutory requirements to the cases in which no certificate was filed.
 
 Therefore, although King’s attempts might be considered a, good faith effort to arbitrate, in the sense that he tried to comply and filed the best certificate available to him, he failed to satisfy CJ § 3-2A-0f(b)(l)(i),
 
 which we deem to be an indispensable step in the arbitration process. Therefore, King’s dental malpractice claim was not arbitrated before the HCAO and could not be considered by the circuit court.
 

 Id.
 
 at 309-10, 794 A.2d 723 (emphasis added).
 

 A good-faith effort to meet the certificate requirement is irrelevant if the certificate filed does not meet the requirement of the Act.
 

 Appellants disagree and argue:
 

 [T]he
 
 Watts
 
 decision acknowledges that certificates of merit on their face may be infirm or vague but that subsequent discovery by way of deposition testimony may be used to cure or supplement the certificates. This is in accord with [sjection 3-2A-04(b)(3), which provides that discovery as to the “basis of the certificate” is permitted.
 

 In
 
 Watts,
 
 the fact that the expert named by the claimant was deposed was mentioned and the expert’s testimony was recounted, but nothing said in
 
 Watts
 
 supports the assertion that we “acknowledge^]” in
 
 Watts
 
 that subsequent discovery by way of deposition testimony may be used to cure or supplement the certificate.
 

 
 *650
 
 In support of their argument that an inadequate certificate does not warrant dismissal, appellants rely on
 
 Manzano v. Southern Maryland Hospital, Inc.,
 
 347 Md. 17, 698 A.2d 531 (1997), and
 
 Karl v. Davis,
 
 100 Md.App. 42, 639 A.2d 214 (1994).
 

 Manzano
 
 concerned the dismissal of a medical malpractice case by an arbitration panel chairman for violating a discovery scheduling order. 347 Md. at 21, 698 A.2d 531. The claimant thereafter filed a notice of rejection of the arbitration award and later filed a circuit court action to nullify that award.
 
 Id.
 
 at 30, 698 A.2d 531. The Court of Appeals ruled that the panel chairman abused his discretion when he dismissed the claim because there was no “evidence of wilful or contumacious behavior on the part” of the claimant or her counsel.
 
 Id.
 
 The
 
 Manzano
 
 Court said:
 

 In order to dismiss an action for failure to arbitrate in good faith, a circuit court must find that a party exhibited deliberate or willful behavior with the effect of circumventing the Act’s mandatory arbitration requirement. In the instant case, there is no evidence that [pjetitioner or her counsel caused the delay willfully or deliberately, or that they in any way attempted to avoid arbitration. To the contrary, [pjetitioner had fully participated in the preliminary proceedings, and the chair had been informed that the delay was caused by an uncooperative expert witness. Thus, we hold that [pjetitioner’s claim should not have been dismissed by the circuit court for failure to arbitrate in good faith. We also hold that [pjetitioner’s claim should not have been dismissed by the arbitration panel chair as a sanction for violating the scheduling order. In this case, the failure to comply with the chair’s scheduling order for a mere seven days was not intentional; rather, it was caused by [pjetitioner’s uncooperative expert witness. In addition, the violation was corrected a full nine days before the claim was dismissed, and Respondents suffered no prejudice as a result of the delay. Imposing the extreme sanction of dismissal under the cir
 
 *651
 
 cumstances present here was an abuse of the panel chair’s discretion.
 

 Id.
 
 at 30-31, 698 A.2d 531.
 

 In
 
 Karl, supra,
 
 the plaintiffs sued Dr. Robert J. Davis and alleged that he had made an inaccurate diagnosis of James Karl’s fractured right hand. 100 Md.App. at 45-46, 639 A.2d 214. A HCAO hearing was held at which plaintiffs’ counsel read into evidence a discovery deposition of Dr. A. Lee Osterman, an expert retained by the plaintiffs.
 
 Id.
 
 at 46, 639 A.2d 214. In that discovery deposition, Dr. Osterman voiced the opinion that Dr. Davis had rendered substandard care, but he did not say that he held that opinion to a reasonable degree of medical certainty or probability.
 
 Id.
 
 At the close of plaintiffs’ HCAO case, defense counsel moved for, and was granted, “summary judgment” by the panel chairman due to the plaintiffs’ failure to establish a
 
 prima facie
 
 case of negligence on Dr. Davis’s part.
 
 Id.
 
 at 47, 639 A.2d 214. Defense counsel argued that the fatal deficiency in plaintiffs’ case was that Dr. Osterman’s opinion was not shown to be to “a reasonable degree of medical probability.”
 
 Id.
 
 The plaintiffs filed a notice of rejection of the claims and asked the circuit court “to nullify the arbitration decision.”
 
 Id.
 
 The circuit court dismissed the case due to the plaintiffs’ failure to arbitrate in good faith.
 
 Id.
 

 We said in
 
 Karl:
 

 Upon examination, we cannot conclude, under the facts and circumstances of this case, that the conduct of appellants’ counsel evidenced a lack of good faith in an effort to circumvent the mandatory requirement that medical negligence cases be submitted to arbitration to undergo a thorough dispute resolution process prior to presenting the controversy to circuit court.
 

 Our holding is, of course, limited to the unique facts of this case. In the future, therefore, if the plaintiffs entire evidence before the HCA[0], regarding standard of care, consists of a transcript of opinions not expressed to a reasonable degree of medical probability by the plaintiff’s
 
 *652
 
 expert during his or her discovery deposition, the plaintiff will not have made a good faith effort to arbitrate. To hold otherwise would be to invite counsel to abuse the arbitration process by use of discovery depositions containing inadmissible opinions.
 

 Id.
 
 at 59, 639 A.2d 214.
 

 Neither
 
 Manzano, supra,
 
 or
 
 Karl, supra,
 
 are here apposite. Both involved the issue of whether the claimants made a good-faith effort to arbitrate, not whether the requirement that a proper certifícate be filed had been met.
 
 Manzano,
 
 347 Md. at 30-31, 698 A.2d 531;
 
 Karl,
 
 100 Md.App. at 59, 639 A.2d 214. Those cases in no way contradict the holding in
 
 Watts
 
 that a good-faith effort to meet the certificate requirement is irrelevant.
 
 Watts,
 
 143 Md.App. at 309-10, 794 A.2d 723.
 

 V.
 
 CONCLUSION
 

 The experts who signed the certificates in this case against scores of defendants did not attest that
 
 any of
 
 the defendants had caused harm to Mr. D’Angelo due to a deviation from the appropriate standard of care. In view of the state of knowledge of the certifying experts, this was not a result of a mere inadvertent error. And, even as of the date the case was dismissed, without prejudice, plaintiffs’ counsel still did not know whether many of the defendants had deviated from the applicable standard of care. This deficiency was exacerbated by the failure of plaintiffs’ counsel to file with the certificate a report by the certifying doctor as mandated by section 3-2A-04(b)(3). The certificates of the type appellants filed in the HCAO fulfill no useful purpose whatsoever and were not in compliance with the requirements of section 3-2A-04(b). We therefore hold that the motions judge did not err in dismissing appellants’ claims.
 

 JUDGMENT AFFIRMED;
 

 COSTS TO BE PAID BY APPELLANTS.
 

 [1]
 

 . All statutory references in this opinion are to the Courts and Judicial Proceedings Article of the Annotated Code of Maryland (1973, 2002 Repl.Vol.).
 

 [2]
 

 . The statute's requirement that claims (against health care providers) be submitted to arbitration is applicable only where the potential claim
 
 *635
 
 exceeds the District Court's jurisdiction, which is now $25,000. § 3-2A-02(a); § 4-402(d). Here, the medical malpractice claims were alleged to exceed $25,000 in value.
 

 [3]
 

 . Section 3 2A-06B(c) reads:
 

 Waiver by
 
 defendant.—(1) Subject to the time limitation under subsection (d) of this section, any defendant may waive arbitration at any time after the claimant has filed the certificate of qualified expert required by § 3-2A-04 (b) of this subtitle by filing with the Director a written election to waive arbitration signed by the defendant or the defendant's attorney of record in the arbitration proceeding.
 

 [4]
 

 . Questioning at the deposition made it evident that the radiologist who interpreted the June 14, 1999, CT scan was Dr. Saylor—one of the twenty-nine doctors who was sued.
 

 [5]
 

 . Dr. Basil’s reference is to Mandell, Principles and Practice oi- Infectious Disease (1995), page 897.
 

 [6]
 

 . While this appeal was pending, appellant’s counsel filed a wrongful death suit against all of the appellees. A survivorship action was not filed, presumably because of statute of limitations problems. The new HCAO statement of claims was filed on March 5, 2004. No certificate of qualified expert was filed with the new statement of claims.